*323
 
 OPINION
 

 By the Court,
 

 Shearing, J.:
 

 Appellant Anthony Petty argues on appeal that he should be granted a new trial because the district court abused its discretion by prohibiting Petty from presenting character evidence of the victim. We agree with Petty’s contention and reverse and remand for a new trial.
 

 BACKGROUND
 

 Erica Cooper and Tumekga Smith drove to the Sierra Vista Apartment Complex during the evening of September 18, 1997. While lingering in the parking lot, Anthony Petty approached them and asked for a ride; Cooper and Smith denied his request. Petty then returned to Corlina Carter’s apartment where he was staying with his girlfriend and Nedra Turman. Turman testified that Petty was acting paranoid when he returned to the apartment. Petty began packing his belongings and instructed Turman to tell his girlfriend that he was going to take a bus to California in an hour.
 

 Before Cooper and Smith left the apartment complex, they too went to Carter’s apartment. As Cooper and Smith were climbing the stairs to Carter’s apartment, they noticed Billy Ray Watts following them up the stairs.
 

 After Cooper and Smith reached the apartment, Turman answered the door and allowed them to enter. Watts also appeared at the door, but Turman blocked Watts’s entry. Smith went down the apartment hall to the restroom while Cooper sat at the kitchen table. As Watts stood in the doorway, he said he wanted to talk to his “homeboy” Petty. He then pushed his way into the apartment. Watts and Petty then engaged in a conversation about Petty having been released from jail. At some point, Watts pulled a pen (which Petty thought was a weapon) from his pants pocket. Watts began to harass Petty and told Petty he wanted the pants that Petty was packing. Petty told Watts not to mess with him.
 

 Watts then picked up the pair of pants and told Petty that he was taking them. Petty told Watts to quit playing around and one witness testified that Watts responded “you show me the bank,” to which Petty again told Watts to quit playing around. Petty then took out a gun. Watts retreated towards the door as Petty cocked the gun and fired at Watts. Cooper, who had been watching the exchange between Petty and Watts, testified that she did not see Watts reveal a weapon or threaten Petty. After the first shot, Petty
 
 *324
 
 walked towards the door and fired multiple bullets. Watts was left for dead in the entryway to Carter’s apartment. Cooper, Smith, and Turman provided similar testimony recounting the events of the shooting.
 

 At trial, Petty testified in his own defense. He testified that he had been residing at the Sierra Vista Apartments for about ten days prior to the shooting. Petty testified that he had known Watts for seven or eight of those days. He then provided a list of reasons why he was afraid of Watts. According to Petty, he had seen Watts steal a gold chain off a man’s neck and had seen Watts strike people without provocation. Petty had also seen Watts placed in a police car after Watts had hit a 7-Eleven clerk. Further, Petty testified that Watts had previously patted Petty’s pockets in search of money and he continued to be worried that Watts might rob him. Finally, Petty testified that he had witnessed Watts shoot a gun randomly into the air.
 

 Petty had also heard many rumors about Watts including: while high on drugs, Watts started a fight with policemen for no reason; Watts had attempted to convince people to participate in robberies; Watts carried a gun; and Watts had shot someone.
 

 Petty testified that before he met Cooper and Smith in the Sierra Vista Apartments parking lot, he had just returned to the apartment project via a taxicab. Petty had $400 in cash on his person because he intended to leave for California that evening. When he got out of the taxi, Watts was standing right in front of him. According to Petty, Watts was “looking at [him] crazy,” as he asked, “What’s up?” Petty replied, “Nothing,” and proceeded to the apartment. He then returned to the parking lot to ask Cooper and Smith for a ride. Turned down, he returned to the apartment to pack his clothing. After Watts had pushed his way into the apartment, Petty testified that Watts began messing with Petty’s belongings. Finally, Petty testified, Watts came up to Petty’s right side and said, “Nigger, Nigger, you see this?” Petty said he saw a sharp, shiny object, and Watts then said, “Nigger, I stick it in your neck.” Petty testified that he didn’t know what the object was but that he thought it could have been an ice pick.
 

 After Watts picked up Petty’s pants and said that he was taking them, Petty testified that Watts was reaching in his pocket and that Petty thought Watts was reaching for a gun. Afraid that Watts might shoot him, Petty testified that he then took out his gun and shot Watts in self-defense. Petty stated that he did not intend to kill Watts, but that he was just shooting and that “he didn’t know what was happening.”
 

 Assessing the crime scene, a senior crime analyst observed the victim’s body on the landing just in front of the doorway to Carter’s apartment. He also observed a pen and pen cap in the
 
 *325
 
 victim’s right hand. Another analyst discovered four spent shell casings—one inside the apartment and three outside the apartment on the ground below the landing. The autopsy revealed Watts had been shot six times. One of these wounds showed that the victim’s body had been against a hard surface because the bullet was not able to fully exit the body.
 

 A jury found Petty guilty of first degree murder with the use of a deadly weapon. The district court sentenced Petty to two consecutive terms of life with possibility of parole after twenty years.
 

 DISCUSSION
 

 Petty argues that the jury trial verdict must be reversed and that he must be granted a new trial because the district court erred by prohibiting the defense from presenting evidence of the victim’s character for violence. This court will overturn a district court’s decision to admit or exclude evidence only when there has been an abuse of discretion.
 
 See
 
 Greene v. State, 113 Nev. 157, 166, 931 P.2d 54, 60 (1997). Admissible character evidence is governed by statute.
 

 NRS 48.045(1)(b) states:
 

 1. Evidence of a person’s character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
 

 (b) Evidence of the character or a trait of character of the victim of the crime offered by an accused . . . and similar evidence offered by the prosecution to rebut such evidence[.]
 

 Furthermore, NRS 48.055 provides:
 

 1. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or in the form of an opinion. . . .
 

 2. In cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof of specific instances of his conduct may be made on direct or cross-examination.
 

 This court has held that NRS 48.045(l)(b) permits the accused to present evidence of the character of a crime victim regardless of the accused’s knowledge of the victim’s character when it tends to prove that the victim was the likely aggressor.
 
 See
 
 Burgeon v. State, 102 Nev. 43, 46, 714 P.2d 576, 578 (1986). With regard to NRS 48.055(1), we stated in
 
 Burgeon
 
 that “proof of character
 
 *326
 
 may be established by testimony as to reputation or in the form of an opinion.”
 
 Id.
 
 Moreover, in
 
 Burgeon
 
 we instructed:
 

 When it is necessary to show the state of mind of the accused at the time of the commission of the offense for the purpose of establishing self-defense, specific acts which tend to show that the deceased was a violent and dangerous person may be admitted, provided that the specific acts of violence of the deceased were known to the accused or had been communicated to him.
 

 Id.
 
 at 45-46, 714 P.2d at 578.
 

 At trial, Petty offered evidence to prove Watts’s violent character through the testimony of two probation officers and a police officer whom the victim had assaulted. The first probation officer was to provide testimony regarding a pre-sentence report on Watts evaluating Watts’s criminal history after Watts had been convicted of robbery with the use of a deadly weapon in 1990. The second probation officer was to provide testimony on a second presentence report evaluating Watts after he was convicted of pointing a firearm at a human being in 1997. Petty argues that both probation officers intended to testify that Watts exhibited definite violent characteristics.
 

 Petty wished to present the probation officers’ testimony to support his self-defense theory. This defense placed the character of the victim, Watts, at issue. As we recognized in
 
 Burgeon,
 
 while presenting a defense of self-defense, an accused is permitted to present evidence suggesting that the victim had exhibited violent behavior. One method of presenting this evidence is through opinion testimony. Here, both probation officers were to provide opinion testimony regarding their previous determinations that Watts showed a violent character. Petty also offered to present a police officer, previously assaulted by the victim, to provide opinion testimony that Watts had a violent character. While the officer’s proffered testimony was based on only one incident, the testimony was to be couched as his opinion. Since the testimony of the probation officers and the police officer would have reflected their opinions, such testimony was admissible at trial under NRS 48.045 and NRS 48.055 where the accused is presenting a defense of self-defense. We hold that the district court abused its discretion by excluding this evidence.
 

 Additionally, the district court refused to allow Petty to present copies of Watts’s 1990 and 1997 convictions. The district court properly excluded evidence of the 1997 conviction, but abused its
 
 *327
 
 discretion by excluding the 1990 conviction evidence. As we stated in
 
 Burgeon,
 
 the accused may present evidence of specific acts to show the accused’s state of mind at the time of the commission of the crime only if the accused had knowledge of the specific act. 102 Nev. at 45-46, 714 P.2d at 578. The record reveals that Petty was aware that Watts had committed robberies. Although Petty’s testimony does not explicitly mention the 1990 robbery, we hold that the evidence is admissible for purposes of showing the reasonableness of the appellant’s state of mind according to NRS 48.055(2) and our reasoning in
 
 Burgeon.
 
 However, nothing in the record indicates that Petty had any knowledge of Watts’s conviction for pointing a deadly weapon at a person. Petty’s testimony revealed that he had seen Watts fire a gun into the air, but Petty did not appear to know anything about the 1997 conviction. Thus, the district court should have admitted the 1990 conviction to show the accused’s state of mind, but properly excluded the 1997 conviction as irrelevant on that issue.
 

 Petty raises other issues on appeal; however we do not address these issues in view of our decision that exclusion of the evidence of the victim’s character warrants a new trial.
 

 The judgment of conviction of first degree murder with use of a deadly weapon is reversed and remanded to the district court.
 

 Maupin and Becker, JJ., concur.