DORION DANIEL, APPELLANT, v. THE STATE OF NEVADA, RESPONDENT.

No. 38857

November 3, 2003                                78 P.3d 890

---

*JoNell Thomas,* Las Vegas, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *David J. Roger,* District Attorney, *Clark A. Peterson,* Chief Deputy District Attorney, and *Christopher J. Lalli,* Deputy District Attorney, Clark County, for Respondent.

Before the Court EN BANC.

## OPINION

*Per Curiam:*

Appellant Dorion Daniel[1] was accused and tried in connection with the shooting deaths of two men and the non-fatal shootings of

---

[1] We direct the clerk of this court to amend the caption on this court's docket to conform with the caption on this opinion.

two others in an apartment in Las Vegas. He was convicted, pursuant to a jury trial, of two counts of first-degree murder, two counts of attempted murder with use of a deadly weapon, and one count of burglary while in possession of a firearm. After the jury deadlocked over the proper penalty, a three-judge panel imposed two death sentences for the murders.[2]

A number of trial errors occurred in this case. The district court erred in meeting privately with a State witness without making a record of the meeting, in answering questions from the jury without notifying counsel and without making a record of the answers given, in allowing questioning regarding appellant's prior arrests, in limiting appellant's presentation of evidence regarding the violent character of the victims, and in not allowing questioning of a juror about possible prejudice against appellant. Due to the quantity and character of this cumulative error and the gravity of the crime charged and the penalty sought,[3] we reverse appellant's judgment of conviction and remand for further proceedings consistent with this opinion.

## FACTS

Appellant shot and killed Frederick Washington and Mark Payne early in the morning on July 28, 1997. Appellant also shot Terhain Woods and Antione Hall; however, they survived their wounds. Woods and Hall testified that they, appellant, Payne, and a fifth person, Sadie Parker, were in Washington's apartment along with Washington when the crimes occurred. Appellant, Woods, Hall, Washington, and Payne were in the front room while Parker was in the kitchen. Woods stated he heard a gunshot and as he turned to his left, he was shot three times by appellant. Hall testified that appellant shot him after appellant shot Washington and Woods. Both Woods and Hall pretended to be dead. They both testified that Payne ran from the living room into the kitchen with appellant in pursuit and that they heard gunshots from the kitchen. Woods indicated appellant walked back into the living room and out the front door.

Woods then dialed 911 while Hall went to lock the back door of the apartment. Because Woods' injuries interfered with his speech, Hall took the phone from Woods and spoke to the 911 operator. Woods and Hall testified that Woods motioned towards a closet for Hall to retrieve Washington's handgun from the closet. Hall un-

---

[2]The State concedes that the death sentences must be reversed pursuant to the recent decisions in *Ring v. Arizona,* 536 U.S. 584 (2002), and *Johnson v. State,* 118 Nev. 787, 59 P.3d 450 (2002).

[3]*See Leonard v. State,* 114 Nev. 1196, 1216, 969 P.2d 288, 301 (1998) (noting that factors relevant to a claim of cumulative error include whether the issue of innocence or guilt is close, the quantity and character of the error, and the gravity of the crime charged).

derstood Woods' gesture, obtained the weapon, cocked it, and sat on the floor. Woods and Hall indicated that Hall placed the gun on the floor near Washington when they heard the police arriving.

Woods and Hall indicated that Woods and Washington had argued with appellant earlier in the day over a refusal to give appellant ten dollars. At the time of the shooting, Woods and Washington had just arrived at the apartment and Washington was watching television when he was shot. According to Woods and Hall, Washington did not argue with or threaten appellant before appellant began shooting.

Parker testified that she was in the kitchen cooking when Woods and another man entered the apartment through the front door. Less than a minute went by, during which she heard some talking, and then gunfire erupted. Parker ran out the back door. She stated she did not hear any arguing, yelling, or threatening words before the shooting began, and she had not seen any of the men in the apartment with a gun.

LVMPD Officers John Segura and Mark Perry arrived at the apartment at 1:19 a.m., about four minutes after the 911 call was received. Woods opened the door and ''gargled something to the effect he had been shot.'' Payne was found dead in the kitchen. A gun was on the floor near Washington's body.

In addition to the testimony of Woods, Hall, Parker, and the responding officers, the prosecution presented evidence suggesting that appellant may have shot Washington because appellant believed that Washington was involved in the murder of a person named John Lee Davis. The State also presented evidence of appellant's drug usage, suggesting the argument over the ten dollars involved appellant's desire to buy drugs. Finally, the State presented testimony that the day after the shootings, appellant appeared in an angry state at the hospital where Hall and Woods were receiving treatment and that appellant tried to get to Hall and Woods.

About twelve hours after the crimes, Detectives Brent Becker and Mike Frank questioned appellant after informing him of his *Miranda*[4] rights. Initially appellant denied any involvement, but after the detectives mentioned the possibility of self-defense, appellant changed his story and claimed he shot the victims in self-defense. Appellant told the detectives that he knew that Washington had killed John Lee Davis.[5] An analysis of appellant's blood after he was arrested showed the presence of phencyclidine (PCP or angel dust).

An autopsy showed that Payne sustained two gunshot wounds: one to the back of his head, above and behind the right ear, and the

---

[4] *Miranda v. Arizona,* 384 U.S. 436 (1966).

[5] Testimony was presented indicating that the police had not identified Washington as a suspect in the Davis shooting.

other to the back of the right thigh. He also had lacerations on his face. Washington suffered a single gunshot to the top of his head.

Testifying in his defense, appellant admitted to the shootings but claimed that he acted in self-defense. Appellant testified that Washington, Woods, and Hall all had reputations for being violent. Appellant knew that Hall usually carried a gun and had seen him shoot at people on two occasions. As to Woods, appellant stated that Woods claimed to have shot and killed four people. Appellant also indicated that he saw Woods beat up one police officer and that Woods bragged about beating up several others. Finally, appellant said he saw Washington shoot at people on two occasions and that Washington had said that he once attempted to rob a Church's Chicken. Appellant also stated that Washington claimed that Hall and Washington had shot a man in the head.

According to appellant, he, Washington, Woods, and Hall sold drugs out of Washington's apartment. On the afternoon before the shootings, Washington and Woods pressed him to set up the robbery of a drug dealer that appellant knew. Appellant refused. When he went to Washington's apartment for the final time that night, he had a gun because he was carrying $3,000 to buy drugs from that dealer. They again asked him to set up the dealer, and he again refused. He then went upstairs to use the bathroom, and when he returned Washington started an argument with him. As the confrontation intensified, Washington pulled out a gun while still sitting on the couch. Appellant pulled his own gun, and when Washington rose up and got ready to cock his gun, appellant stepped to the side and shot Washington. Appellant testified that Hall then jumped up and came towards appellant so appellant shot him twice. Woods was reaching for the gun on the floor so appellant shot him. Appellant ran to the kitchen, saw Payne reaching up above the refrigerator, and shot him. Appellant then ran out the back door. He stated he did not shoot Parker because he did not think she was a threat.

Appellant admitted that he went to the hospital, but indicated he was only there to talk with a friend about what had happened. No one was there so he went to his federal parole supervisor. His supervisor called the police, and two officers soon arrived. Appellant explained that the PCP found in his blood was the result of smoking marijuana and PCP after the shooting. Appellant denied that he thought Washington was responsible for killing John Lee Davis.

Several other witnesses testified for the defense. An LVMPD detective and a fast-food restaurant employee testified that in their opinion Washington was a violent person. Another detective and a parole officer testified that in their opinion Payne was a violent person.

The jury returned guilty verdicts on all five counts. The jury was unable to reach a unanimous verdict during the penalty phase, and

a mistrial was declared. Appellant opposed convening a three-judge panel to decide on a penalty, arguing that the procedure was unconstitutional. The district court rejected appellant's argument, and a three-judge panel was convened. The panel found two aggravating circumstances for each murder: the murder was committed by a person who was convicted in the immediate proceeding of more than one offense of murder, and the murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody. The panel also found mitigating circumstances existed but that the aggravating circumstances were not outweighed by the mitigating circumstances. The panel returned death sentences for both murders.

## DISCUSSION

Appellant claims multiple incidents of error. Appellant contends the district court erred by: (1) conducting numerous conferences off the record in violation of SCR 250, thus denying appellant meaningful appellate review; (2) interviewing a witness outside the presence of the defendant, his counsel, and counsel for the State; (3) responding to juror questions without consulting with counsel; (4) permitting the State to cross-examine appellant about arrests that did not result in criminal prosecutions; (5) excluding extrinsic evidence of violent acts committed by the victims; (6) refusing to allow defense counsel to examine a juror regarding possible bias for the State or prejudice towards appellant; (7) allowing the State to ask appellant if witnesses were lying; (8) refusing to give a jury instruction on lost evidence; (9) limiting appellant's closing argument; (10) refusing various jury instructions; and (11) refusing to poll the jury to determine if the jury had unanimously rejected death and had deadlocked on a lesser sentence.

### I.  Unrecorded conferences and appellate review

Appellant complains that he has been denied meaningful appellate review because the district court conducted numerous conferences without having them reported, or recorded, and transcribed. Before trial, appellant moved the district court to have all the proceedings of his case reported and transcribed, citing SCR 250 among other authorities. The district court denied the motion.

Only rarely should a proceeding in a capital case go unrecorded. SCR 250(5)(a) expressly requires the district courts to

> ensure that all proceedings in a capital case are reported and transcribed, but with the consent of each party's counsel the court may conduct proceedings outside the presence of . . . the court reporter. If any objection is made or any

issue is resolved in an unreported proceeding, the court shall ensure that the objection and resolution are made part of the record at the next reported proceeding.

Moreover, "'meaningful, effective appellate review depends upon the availability of an accurate record covering lower court proceedings relevant to the issues on appeal. Failure to provide an adequate record on appeal handicaps appellate review and triggers possible due process clause violations.'"[6] A capital defendant therefore has a right to have proceedings reported and transcribed. We recognize, however, that this right is not absolute. SCR 250 and due process do not require the presence of the court reporter at every sidebar conference, but the court must make a record of the contents of such conferences at the next break in the trial and allow the attorneys to comment for the record. Similarly, while potential jury instructions can be discussed off the record preliminarily, the instructions must be settled on the record with each party given the opportunity to state its objection to any instruction and explain any requested instruction. Absent objection to or request for an instruction, appellate consideration of the issue is precluded.[7]

The mere failure to make a record of a portion of the proceedings, however, standing alone, is not grounds for reversal. Rather, an appellant must demonstrate that the subject matter of the missing portions of the record was so significant that the appellate court cannot meaningfully review an appellant's contentions of error and the prejudicial effect of any error. Here, the portions of the proceedings that were not, or were only partially, reported were not significant enough, in and of themselves, to prevent a meaningful review of the appeal. Thus, we reject appellant's contention that failure to comply with SCR 250 denied him a meaningful review of his conviction.

## II. Unrecorded ex parte witness interview

Appellant contends that the district court committed serious error when it held an unrecorded ex parte meeting with a witness for the State after the witness initially declined to testify. Woods, a key witness for the State, invoked his Fifth Amendment right to remain silent soon after being called to testify. The jury was excused so that the district court could inquire into the basis for Woods' assertion of the Fifth Amendment. After the jury exited the courtroom, the district court asked Woods if he wanted an attorney appointed for him, and he declined. The prosecutor informed the

[6]*Lopez v. State,* 105 Nev. 68, 84-85, 769 P.2d 1276, 1287 (1989).

[7]*Etcheverry v. State,* 107 Nev. 782, 784-85, 821 P.2d 350, 351 (1991).

court he did not intend to ask Woods any questions that might lead to an incriminating response, but defense counsel indicated she did intend to ask such questions. Woods told the court that he did not want to speak to the prosecutors about his decision to remain silent and was reluctant to identify the basis for his assertion of the right.

*Sua sponte,* the district court then announced that it would take the matter up in camera. The court stated: "I'm going to inquire of Mr. Woods what his concerns are and make a determination if, in fact, he has a legitimate right to refuse to testify." Neither counsel objected to this procedure. The district court met with Woods in chambers without counsel and without recording the discussion. Returning to the courtroom without Woods, the district court told both parties that it had informed Woods that the Fifth Amendment gave him the right to avoid self-incrimination. According to the district court, Woods said that he was not afraid of self-incrimination but of retaliation from appellant's family or friends, though he "did not indicate any specific threats made to him by the defendant or anyone else."

Woods returned to the courtroom, and the prosecutor informed him that the State was willing to provide him with protection if necessary. The district court informed Woods that if he refused to answer questions it could find him in contempt and sentence him to 25 days in jail for each refusal. Woods then said, "If I have no choice, then I'll testify, if I can't invoke this Fifth Amendment." The jury returned, and Woods testified without further incident.

The district court's decision to conduct an ex parte interview with Woods off the record involves two distinct issues. First, may a judge conduct an interview with a witness outside the presence of the parties and counsel, and, if ex parte interviews are permissible, must they be recorded? Second, was Woods coerced into testifying?

Ex parte communications on matters of substance are normally impermissible.[8] The district court met with a reluctant witness crucial to the State's case, and as a result of that meeting, the witness withdrew his decision not to testify. This action involved a substantive matter and qualified as an ex parte communication. However, at least one federal court has indicated that an interview conducted outside of the parties' presence, but with the parties' knowledge, may be permissible in extraordinary situations.

In *United States v. Adams,*[9] the Eleventh Circuit Court of Appeals recognized that " 'in very rare circumstances' " a trial

---

[8]*See* NCJC Canon 3(B)(7).

[9]785 F.2d 917, 920 (11th Cir. 1986) (quoting *LaChappelle v. Moran,* 699 F.2d 560, 565 (1st Cir. 1983)).

judge may confer with a witness or juror outside the defendant's presence, *e.g.*, to discuss threats against a witness. However, *Adams* requires the trial judge to ensure that ''the conference is carefully conducted so that no rights of the defendant are threatened.''[10] The Eleventh Circuit concluded that the conference at issue in that case was fairly conducted because the substance of the witness's testimony was not discussed and the entire conference was transcribed.[11] Here, by contrast, the district court failed to record its meeting with the witness, and we cannot know whether the substance of the witness's testimony was discussed. Moreover, although the State asserts that ''[t]here is no evidence that the judge employed coercive or intimidating language or tactics that would have substantially interfered'' with Woods' decision to testify, we cannot conduct a meaningful review of the issue for error since we have no record of the meeting itself. The district court erred in failing to record its conversation with the witness. This error alone might not warrant reversal but it is a significant part of the cumulative error leading to our conclusion that reversal is necessary.[12]

### III. Jury questions

Appellant contends that the district court violated his rights when it answered two questions from the jury without first consulting with counsel. After the jury had begun penalty deliberations, the district court spoke to both parties about questions from the jury.

> I would like the record to reflect the fact that Thursday, near the end of the day, the court received a note from the foreman of the jury, Mr. Smith, which contained two questions . . . . First question: ''What if we're a hung jury, does everything we've done not count? '' . . . The second question: ''Does 40 years really,'' underline really, ''mean 40 years? '' No doubt he's alluding to the eligibility of parole.
>
> This morning, Friday morning, when the jury reconvened . . . , I had sent my bailiff in with very brief answers to these questions. As to the first, . . . I had my bailiff indicate to the jurors that if they were a hung jury on the penalty phase that there would be a three-judge panel appointed to resolve the question of penalty, but the determination of guilt would stand. As to the second question, . . . the answer

---

[10]*Id.*

[11]*Id.*

[12]Because appellant requested that all proceedings be reported under SCR 250(5)(a), the failure to contemporaneously request that the interview with Woods be reported does not require a plain error analysis under NRS 178.602.

was yes. I asked the bailiff to commend them to the jury instructions . . . .

That afternoon the jurors informed the court that they were deadlocked.

According to appellant, the district court's improper communication deprived him of the right to a fair verdict from the jury and requires the imposition of a sentence less than death. He reasons, in part, that by telling the jury that a three-judge panel would decide the penalty if the jury did not, the court minimized to the jury the gravity of its decision. He cites the Supreme Court decision in *Caldwell v. Mississippi,* which held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."[13] However, the holding in *Caldwell* is not controlling because it is concerned with a jury returning a death sentence under the misimpression that the responsibility for the sentence ultimately lies elsewhere.[14] The jury here did not return a sentence at all.

The district court did err, however, by failing to notify counsel before communicating to the jury on a substantive matter.[15] Such error is harmless when the instructions given are correct.[16] However, we cannot determine whether the error was harmless here because again the district court failed to make an adequate record for appellate review. The court improperly instructed the jurors orally through the bailiff, rather than in writing or directly in the courtroom on the record. Therefore, the record before us does not reveal the instructions received by the jury, only the district court's rendition of what it told the bailiff. And most important, exactly what the bailiff said to the jury is unknown.

We do not decide whether this error alone would be reversible but do consider it as part of the cumulative error requiring reversal.

## IV. Use of prior arrests on cross-examination

Appellant contends that the district court improperly permitted questioning regarding his prior arrests. We agree.

---

[13]472 U.S. 320, 328-29 (1985).

[14]*Cf. Geary v. State,* 112 Nev. 1434, 1451, 930 P.2d 719, 730 (1996), *clarified on other grounds on rehearing,* 114 Nev. 100, 952 P.2d 431 (1998).

[15]*See* NRS 175.451; *Cavanaugh v. State,* 102 Nev. 478, 484, 729 P.2d 481, 484-85 (1986).

[16]*Cavanaugh,* 102 Nev. at 484, 729 P.2d at 484-85.

On direct examination, defense counsel asked appellant, "So you didn't necessarily at that point [July 1997] have a great reputation for violence, as far as you knew?" Appellant answered, "No, no, not that I knew of." On cross-examination, the State asked appellant if he had been arrested in 1989 and 1990 for battery, five counts of attempted murder, obstructing a police officer, false imprisonment, battery with substantial bodily harm, battery with a deadly weapon, and first-degree kidnapping. He admitted that he had. On redirect, defense counsel elicited that appellant was not prosecuted for any of these arrests. The district court refused to allow appellant to present evidence on the circumstances of the arrests and the reasons prosecutions were not pursued.

Appellant argues that questions about his prior arrests constituted improper character evidence under NRS 48.045(2), which prohibits the admission of evidence of other crimes, wrongs, or acts to prove a person's character. However, NRS 48.045(2) is not the pertinent provision in this case because appellant placed his character in issue on direct examination. Thus NRS 48.045(1)(a) is controlling. It provides that once a criminal defendant presents "[e]vidence of his character or a trait of his character" the prosecution may offer similar evidence in rebuttal.

NRS 48.055(1) provides that this evidence must be in the form of reputation or opinion testimony and allows a party to test such testimony on cross-examination by inquiry into the witness's knowledge of "specific instances of conduct." Therefore, because appellant testified regarding his reputation, the State was entitled to cross-examine him on relevant specific acts. However, questions asking whether or not someone has been arrested do not relate to "specific instances of conduct."

The Eighth Circuit Court of Appeals concluded that questioning about arrests was improper in *United States v. Bruguier*.[17] In that case, after a witness testified that the defendant was a good father, the government asked on cross-examination, " '[D]o you think it is a good father to be arrested 36 times?' "[18] The Eighth Circuit rejected "the government's contention that arrests prove anything."[19]

> An arrest shows only that the arresting officer thought the person apprehended had committed a crime, assuming that the officer acted in good faith, which will usually but not always be the case. An arrest does not show that a crime in fact has been committed, or even that there is probable cause for be-

---

[17]161 F.3d 1145 (8th Cir. 1998).

[18]*Id.* at 1150.

[19]*Id.*

lieving that a crime has been committed. The question, accordingly, should not have been asked.[20]

Although an arrest alone is not an adequate basis to cross-examine a witness about reputation or opinion testimony, questions about the specific acts and circumstances that culminated in the arrest may be proper.[21] However, before allowing inquiry into facts harmful to the defendant's character that are not otherwise in evidence, the trial court must determine, outside the presence of the jury, whether the prosecution has a reasonable, good-faith basis for its belief that the defendant committed the acts subject to the inquiry.[22] Both sides may present evidence regarding the acts underlying the arrest and the reasons no conviction was obtained. The mere fact of an arrest is not a basis for inquiry.[23]

Assuming the State had a good-faith basis for believing appellant committed any of the violent acts leading to the arrests in 1989 and 1990, then the cross-examination should focus on the acts, not the fact of an arrest. The State could have asked appellant, for example, if he had been involved in attempted murder.

The district court erred in permitting the State to cross-examine appellant on mere arrests. The district court compounded the error when it refused to allow appellant to present evidence on the circumstances of the arrests and why no prosecutions were pursued. We do not decide if the error, standing alone, warrants reversal given the cumulative error in this case.

## V.  Victim character evidence

Appellant contends that the district court improperly excluded independent evidence of specific violent acts committed by the victims and known to appellant prior to the shootings. The district court allowed appellant to relate his knowledge of specific violent acts by the victims, and it allowed other witnesses to give their opinion as to the victims' violent character. Appellant wanted to present additional evidence to corroborate his own testimony regarding specific acts by the victims, but the court did not allow that.

This court overturns a district court's decision to admit or exclude evidence only in the case of abuse of discretion.[24] NRS

---

[20]*Id.*

[21]*Cf. U.S. v. Robinson,* 978 F.2d 1554, 1560-61 (10th Cir. 1992).

[22]*Bruguier,* 161 F.3d at 1149.

[23]*Cf. U.S. v. Wilson,* 244 F.3d 1208, 1217-18 (10th Cir. 2001).

[24]*Petty v. State,* 116 Nev. 321, 325, 997 P.2d 800, 802 (2000).

48.045(1) sets forth the rule that character evidence is normally not admissible to show that persons have acted in conformity with their character. NRS 48.045(1) also provides three exceptions to the rule, and one is pertinent to the issue at hand: "(b) Evidence of the character or a trait of character of the victim of the crime offered by an accused . . . and similar evidence offered by the prosecution to rebut such evidence . . . ." This exception permits a defendant to present evidence of a victim's character when it tends to prove that the victim was the likely aggressor, regardless of the defendant's knowledge of the victim's character.[25]

As previously explained, under NRS 48.055(1), when character evidence is admissible, "proof may be made by testimony as to reputation or in the form of an opinion." Evidence of specific instances of conduct is generally not admissible because " 'it possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time.' "[26] However, a party can test reputation or opinion evidence on cross-examination by inquiry into the witness's knowledge of relevant specific acts.[27]

In addition, NRS 48.055(2) provides: "In cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof of specific instances of his conduct may be made on direct or cross-examination." However, the use of specific acts under NRS 48.055(2) is confined " 'to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry.' "[28]

Appellant invokes this provision, asserting that a victim's propensity for violence is an element of the claim of self-defense and therefore that the district court should have allowed evidence of specific acts on this ground. He provides no analysis and cites no other authority to support this assertion. We conclude that the character of the victim is not an essential element of self-defense—unlike the defense of entrapment, for example, which makes a defendant's predisposition to commit the charged crime an essential

---

[25]*Id.*

[26]*Foster v. State,* 116 Nev. 1088, 1095, 13 P.3d 61, 65 (2000) (quoting Fed. R. Evid. 405 advisory committee's note (1975)) (stating that NRS 48.055 is based on Fed. R. Evid. 405).

[27]NRS 48.055(1).

[28]*See Foster,* 116 Nev. at 1095, 13 P.3d at 65 (quoting Fed. R. Evid. 405 advisory committee's note).

element of the prosecution's case.[29] As the Ninth Circuit Court of Appeals has explained, to determine whether character constitutes an essential element, the relevant question is: "would proof, or failure of proof, of the character trait by itself actually satisfy an element of the charge, claim, or defense?"[30]

Even if a defendant proves that a victim was a violent person, it does not establish an element of self-defense: proving that a person has a violent character does not prove that the person was the assailant or acted in such a way that the defendant reasonably believed it was necessary to use force against the person.[31] Nor does lack of proof that a victim had a violent character constitute a failure to prove self-defense: a victim's violent character is relevant but not required to establish self-defense.[32] Therefore, NRS 48.055(2) was not a basis for the admission of evidence of specific acts by the victims.

However, this court has held that evidence of specific acts showing that the victim was a violent person is admissible if a defendant seeks to establish self-defense *and was aware of those acts.*[33] This evidence is relevant to the defendant's state of mind, *i.e.,* whether the defendant's belief in the need to use force in self-defense was reasonable.[34] In this case, the district court allowed appellant to testify concerning the victims' specific acts within his knowledge, but did not allow extrinsic evidence of those acts and limited appellant's cross-examination of the surviving victims. To corroborate his testimony regarding violent acts by the victims, appellant be-

---

[29]*See id.* at 1095, 13 P.3d at 66 (explaining that the defense of entrapment places a defendant's character, his predisposition to commit the charged crime, "directly in issue" and entitles the State pursuant to NRS 48.055(2) to offer evidence of specific instances of the defendant's conduct).

[30]*U.S. v. Keiser,* 57 F.3d 847, 856 (9th Cir. 1995).

[31]NRS 200.200 provides:

If a person kills another in self-defense, it must appear that:
1. The danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and
2. The person killed was the assailant, or that the slayer had really, and in good faith, endeavored to decline any further struggle before the mortal blow was given.

*See also Hill v. State,* 98 Nev. 295, 296, 647 P.2d 370, 370-71 (1982) ("[T]he defendant's belief in the necessity of using force in self-defense must be reasonable."); NRS 200.130.

[32]*See Keiser,* 57 F.3d at 857.

[33]*Burgeon v. State,* 102 Nev. 43, 45-46, 714 P.2d 576, 578 (1986).

[34]*Id.*

lieves he should have been allowed to cross-examine the surviving victims on their violent conduct and to call witnesses to testify to being robbed or assaulted by the victims. We agree.

In *Petty v. State*,[35] this court held that the district court abused its discretion in excluding evidence of the victim's prior conviction where the defendant claimed self-defense. The evidence of the victim's prior conviction for robbery was admissible because the defendant was aware that the victim had committed robberies.[36] Therefore, under *Petty*, extrinsic evidence of a victim's specific conduct known to the defendant is admissible in the form of prior convictions. We conclude that extrinsic evidence of such conduct is also admissible in the form of corroborating testimony. We agree with the Wisconsin Supreme Court, which has held that a defendant should be allowed

> to produce supporting evidence to prove the particular acts of which the accused claims knowledge, thereby proving the reasonableness of the accused's knowledge and apprehension of the victim and the credibility of his assertions about his state of mind. . . . [T]he self-serving nature of an accused's testimony about prior violent acts of the victim makes corroborating evidence of those acts particularly important for an accused's claim of self-defense.[37]

We also agree that the admission of evidence of a victim's specific acts, regardless of its source, is within the sound and reasonable discretion of the trial court and is limited to the purpose of establishing what the defendant believed about the character of the victim.[38] The trial court "should exercise care that the evidence of specific violent acts of the victim not be allowed to extend to the point that it is being offered to prove that the victim acted in conformity with his violent tendencies."[39]

Thus, when a defendant claims self-defense and knew of relevant specific acts by a victim, evidence of the acts can be presented through the defendant's own testimony, through cross-examination of a surviving victim, and through extrinsic proof. Here, the district court abused its discretion in unduly limiting appellant's cross-examination of the surviving victims and in completely excluding

---

[35] 116 Nev. 321, 997 P.2d 800.

[36] *Id.* at 326-27, 997 P.2d at 803.

[37] *State v. Daniels*, 465 N.W.2d 633, 636 (Wis. 1991).

[38] *Id.* at 636-37.

[39] *Id.* at 637.

testimony by defense witnesses regarding prior violent conduct by the victims known to appellant.

This error alone was not so prejudicial that it requires reversal, but it contributes to the cumulative error, which does.

## VI.  Juror impartiality

Appellant claims that his right to an impartial jury was violated when the district court refused to question a juror on a comment she made. We agree that the court erred in not permitting questioning of the juror.

During the trial as the jurors entered the courtroom, one asked the bailiff in a whisper, "Why isn't the defendant in shackles?" The bailiff told her he could not answer that question and that she should not worry. Defense counsel did not move to dismiss the juror but requested the district court to question her to determine whether she was prejudiced due to fear of appellant or biased in favor of the prosecution. The prosecutor opposed the request, and the district court did not allow the juror to be questioned.

A criminal defendant is entitled to appear before the jury clad as an innocent person, and generally it is error to allow the jury to see a defendant shackled.[40] More broadly, under the Sixth Amendment—applicable to the states through the Fourteenth Amendment—and principles of due process, a defendant has the right to an impartial jury.[41] To ensure that this right was not violated, the district court should have allowed an inquiry to establish whether the juror was biased. This error alone was not reversible but contributes to the cumulative error in this case.

## VII.  Cross-examination of appellant on other witnesses' credibility

On cross-examination, the prosecutor asked appellant several times if other witnesses had lied or were mistaken. Defense counsel objected unsuccessfully. Appellant responded that some witnesses had lied, and in closing argument, the prosecutor attacked that response. Appellant asserts that the prosecutor's line of questioning was error.

This court has never addressed this precise issue. However, we have held that it is the exclusive province of the trier of fact to pass

[40]*Dickson v. State,* 108 Nev. 1, 3, 822 P.2d 1122, 1123 (1992).

[41]*Bishop v. State,* 92 Nev. 510, 515 n.2, 554 P.2d 266, 270 n.2 (1976).

on the credibility of witnesses: "Thus, a lay witness's opinion concerning the veracity of the statement of another is inadmissible."[42] Review of the cases cited by both appellant and the State reveals that courts generally disapprove of prosecutors asking defendants whether other witnesses have lied. Some consider it erroneous regardless of circumstance, while others permit it only under certain circumstances. Where erroneous questioning occurs, courts review to determine whether the error was prejudicial.

For example, *People v. Overlee*,[43] an opinion by a New York appellate court, states: "While this Court has cautioned prosecutors to avoid goading a testifying defendant into characterizing the People's witnesses as liars, especially when the defendant, by his testimony, has not impugned the truthfulness of those witnesses, such conduct does not always require reversal."[44] *Overlee* distinguishes

> between a defendant's testimony that conflicts with that of the People's witnesses and yet is susceptible to the suggestion that the witnesses spoke out of mistake or hazy recollection and the situation where . . . the defendant's testimony leaves open only the suggestion that the People's witnesses have lied. In the latter circumstance, the prosecution has the right to ask whether the witnesses are liars.[45]

Other courts maintain an unconditional rule against asking a defendant whether other witnesses have lied. A New Mexico appellate court acknowledged that a prosecutor may "engage in good-faith attempts . . . to clarify a defendant's testimony on cross-examination by inquiring about apparent inconsistencies with testimony of another witness" or "to determine if the defendant . . . has an explanation for apparent discrepancies between the testimony of the witness and the testimony of the defendant."[46] However, it imposed "a strict prohibition upon asking the defendant if another witness is 'mistaken' or 'lying.'"[47]

> In asking whether other witnesses were mistaken, the impression communicated to the jury may be that either the witness or the defendant is lying. This is especially true in a criminal case where the defendant is forced to characterize numerous witnesses, including police officers, as "incorrect" or "mistaken" in order for his or her testimony to be credible.[48]

[42]*DeChant v. State,* 116 Nev. 918, 924, 10 P.3d 108, 112 (2000).

[43]666 N.Y.S.2d 572 (App. Div. 1997).

[44]*Id.* at 576 (citations omitted).

[45]*Id.; accord State v. Pilot,* 595 N.W.2d 511, 518 (Minn. 1999); *State v. Morales,* 10 P.3d 630, 633 (Ariz. Ct. App. 2000).

[46]*State v. Flanagan,* 801 P.2d 675, 679 (N.M. Ct. App. 1990).

[47]*Id.*

[48]*Id.* (citation omitted).

The court explained:

> One rationale behind this rule is that it is the role of the jury to determine the credibility of witnesses. Whether the defendant believes the other witnesses were truthful or lying is simply irrelevant. In addition, such questions can constitute in effect a misleading argument to the jury that the only alternatives are that the defendant or the witnesses are liars.[49]

The New Mexico court concluded that in the case before it the improper questions had not prejudiced the defendant because they did not amount to jury argument and did not coax the defendant into accusing other witnesses of lying.[50] Many courts, including the Ninth Circuit Court of Appeals, have reasoned similarly and held that such questioning is improper but may be harmless error.[51]

We adopt a rule prohibiting prosecutors from asking a defendant whether other witnesses have lied or from goading a defendant to accuse other witnesses of lying, except where the defendant during direct examination has directly challenged the truthfulness of those witnesses. Violations of the rule are subject to harmless-error review under NRS 178.598.[52] Because it can be difficult to say whether lying is the only possible explanation for inconsistent testimony, we reject an exception to the rule on that ground.

Appellant did not directly challenge the veracity of other witnesses during his direct examination, so asking him whether other witnesses had lied was inappropriate. Since this court had not expressly ruled on this issue before, we recognize that the prosecutor did not act with wrongful intent. We conclude that this error, standing alone, was not prejudicial.

## VIII. Jury instruction on alleged loss of evidence

Appellant complains that the police investigator lost valuable evidence and that the district court improperly denied his motion for a jury instruction on lost evidence.

A crime scene analyst testified for the State. In investigating the murders, the analyst noticed a small spot of apparent blood on the Ruger pistol found near Washington's body. Using distilled water

---

[49]*Id.* (citations omitted).

[50]*Id.* at 679-80.

[51]*See U.S. v. Sanchez*, 176 F.3d 1214, 1219-20 (9th Cir. 1999); *U.S. v. Sullivan*, 85 F.3d 743, 749-50 (1st Cir. 1996); *U.S. v. Boyd*, 54 F.3d 868, 871-72 (D.C. Cir. 1995); *State v. Casteneda-Perez*, 810 P.2d 74, 77-80 (Wash. Ct. App. 1991).

[52]NRS 178.598 provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

and a cotton swab, he collected a sample at the scene to test for the presence of blood. He did not recall what the spot looked like. The amount of blood was insufficient to conduct DNA analysis.

A forensic expert testified for the defense. He examined the Ruger and found no blood but was able to detect low levels of DNA, which could come from ordinary handling of the gun. The expert determined that the DNA did not come from Woods, Washington, Payne, Hall, or appellant. However, he indicated that did not rule out the possibility that any of them had handled it. He testified that if an object appears to have blood on it, it should be photographed and a diagram should be drawn before a sample is taken. After a sample is taken, another photograph should be taken. He stated that much information could be gained by examining a blood spatter or smear. According to the defense expert, when possible, it was better to collect blood in a laboratory environment rather than at the scene of a crime. In this case, he was unable to find any blood spatter to analyze on the gun or in any photograph.

Appellant contends that the existence or nonexistence of blood spatter on the gun was essential to establishing whether Washington was holding the gun when he was shot. Appellant maintains that his right to a fair trial and to confront the State's evidence was denied when the analyst removed the blood on the gun without first documenting and photographing it. He believes that he was entitled to instruct the jury on a conclusive presumption that the pistol had blood spatter on it consistent with being near Washington when he was shot.

Loss or destruction of evidence by the State violates due process "only if the defendant shows either that the State acted in bad faith or that the defendant suffered undue prejudice and the exculpatory value of the evidence was apparent before it was lost or destroyed."[53] "To establish prejudice, the defendant must show that it could be reasonably anticipated that the evidence would have been exculpatory and material to the defense."[54] "It is not sufficient that the showing disclose merely a hoped-for conclusion from examination of the destroyed evidence" or "that examination of the evidence would be helpful in preparing [a] defense."[55] Appellant has shown neither bad faith nor that it could be reasonably anticipated the evidence in question would have been exculpatory and material. He has at best a hoped-for conclusion that the evidence would have supported his case.

[53]Leonard v. State, 117 Nev. 53, 68, 17 P.3d 397, 407 (2001).

[54]Cook v. State, 114 Nev. 120, 125, 953 P.2d 712, 715 (1998).

[55]Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 108 (1979).

This case is quite different from *Sanborn v. State*,[56] cited by appellant. In that case, Sanborn was convicted of murder. He claimed that he acted in self-defense after the victim shot him, while the State theorized that Sanborn had shot himself. "Mishandling of the gun [that was used to shoot Sanborn] resulted in a loss of evidence of blood and fingerprints," and "there were no witnesses, other than the accused, to [the] homicide."[57] "[E]vidence of blood or fingerprints on the weapon could have been critical, corroborative evidence of self-defense. The state's case was buttressed by the absence of this evidence."[58] This court concluded that the mishandling of the evidence had prejudiced Sanborn, entitling him to a jury instruction setting forth the conclusive presumption that the victim had held and fired the gun.[59]

Here, by contrast, any mishandling of the evidence was minimal: in *Sanborn,* blood and fingerprint tests were not done even though the need for them was obvious, whereas here the analyst did test for blood and fingerprints, and it was not obvious that the *form* of the apparent blood spot had any probative value. Also, here we have three witnesses to the crimes other than the accused, and appellant has not shown that the lost evidence was critical or buttressed the State's case.

## IX. Closing argument and reasonable doubt instruction

Appellant claims that the district court improperly limited his closing argument regarding reasonable doubt. He maintains that as long as his counsel did not quantify or analogize reasonable doubt, counsel had a right to explain its meaning and to quote case law from this court discussing it. This claim is patently meritless: appellant ignores long-standing and unequivocal case law to the contrary. "This court has repeatedly cautioned the district courts and attorneys not to attempt to *quantify, supplement, or clarify* the statutorily prescribed standard . . . ."[60] "[T]he defense bar and prosecutors alike [are] not to *explain, elaborate on, or offer analogies or examples* based on the statutory definition of reasonable doubt. Counsel may argue that evidence and theories in the case before the jury either amount to or fall short of that definition—

---

[56]107 Nev. 399, 812 P.2d 1279 (1991).

[57]*Id.* at 408, 812 P.2d at 1285.

[58]*Id.* at 408, 812 P.2d at 1285-86.

[59]*Id.* at 408, 812 P.2d at 1286.

[60]*Evans v. State,* 117 Nev. 609, 631, 28 P.3d 498, 514 (2001) (emphasis added); *see also* NRS 175.211 (setting forth the only definition of reasonable doubt that may be given to Nevada juries in criminal cases).

*nothing more.*"[61] This stricture is unqualified and cannot be avoided by offering explanations of reasonable doubt taken from judicial opinions.

Appellant also contends that the district court erred in refusing to give a proposed jury instruction quoting from cited cases discussing the propriety of the death penalty. The district court allowed defense counsel to argue that death is "an inappropriate punishment for a substantial portion of convicted first-degree murderers," but the court refused to instruct the jury on this proposition or to allow counsel to cite its source, the United States Supreme Court.[62] We conclude that the district court did not abuse its discretion to determine which jury instructions are necessary and pertinent[63] and to limit argument by counsel.[64]

## X. Other jury instructions

Appellant challenges a number of jury instructions. We conclude that the challenges are without merit. He claims that the instructions defining malice were unconstitutional but concedes that this court has repeatedly affirmed the constitutionality of the instructions given. He claims that the instructions on voluntary manslaughter and self-defense lessened the State's burden of proving the elements of murder and criticizes this court's rejection of the doctrine of imperfect self-defense. We conclude that the instructions as a whole properly informed the jury of the State's burden to prove all the elements of murder. Appellant argues that the instructions on reasonable doubt and on "equal and exact justice" were unconstitutional but concedes that this court has repeatedly rejected such arguments.

## XI. Jury polling

Appellant asserts that before dismissing the jurors the district court should have granted his request to poll them to determine

---

[61]*Evans,* 117 Nev. at 632, 28 P.3d at 514 (emphasis added).

[62]The source is *Woodson v. North Carolina,* 428 U.S. 280, 296 (1976) (plurality opinion).

[63]*See* NRS 175.161(2), (3); *see also Vallery v. State,* 118 Nev. 357, 372, 46 P.3d 66, 77 (2002) (stating that a district court may "refuse a jury instruction on the defendant's theory of the case that is substantially covered by other instructions").

[64]*See Manley v. State,* 115 Nev. 114, 125, 979 P.2d 703, 709-10 (1999) (recognizing that district courts can limit argument by counsel but cannot impose undue limits).

whether they had unanimously rejected death and were deadlocked over a lesser sentence. Because appellant argues that imposition of the death penalty after remand and retrial would violate the Double Jeopardy Clause, we reach this issue and conclude that the district court was not required to poll the jurors.[65]

### CONCLUSION

We reverse appellant's judgment of conviction due to cumulative error and remand for a new trial.

---

[65]*Cf. People v. Hickey,* 303 N.W.2d 19, 21 (Mich. Ct. App. 1981); *A Juvenile v. Com.,* 465 N.E.2d 240 (Mass. 1984).