# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES M. HARRISON,
        *Petitioner-Appellant,*

v.

DOUGLAS GILLESPIE,
        *Respondent-Appellee.*

No. 08-16602

D.C. No.
2:08-cv-00802-RCJ-
RJJ

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Nevada[1]
Robert Clive Jones, District Judge, Presiding

Argued August 10, 2009
Submitted August 14, 2009
San Francisco, California

Filed February 22, 2010

Before: Procter Hug, Jr., Stephen Reinhardt and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Silverman

---

[1]In our order granting Harrison's request for a certificate of appealability, we asked the parties to address "who they contend are the proper Respondents in this action." Harrison responded to that order in his opening brief. He asserted that Sheriff Douglas Gillespie is his current custodian and the proper respondent in this action, and requested permission to amend his petition in order to cure his failure to name the proper respondent. The State did not respond to our order or oppose Harrison's request, and thus waived the issue on the custodian's behalf. *See Smith v. Idaho*, 392 F.3d 350, 355-56 (9th Cir. 2004). Accordingly, the clerk is directed that Douglas Gillespie shall be listed as the respondent in this case.

## COUNSEL

JoNell Thomas (argued), David M. Schieck, Scott L. Bindrup, Clark County Special Public Defender, Las Vegas, Nevada; Bret O. Whipple, Law Office of Bret Whipple, Las Vegas, Nevada, for the petitioner-appellant.

Steven S. Owens, Clark County District Attorney, Las Vegas, Nevada, for the respondent-appellee.

## ORDER

At the time of Harrison's sentencing trial and all state court proceedings related to the denial of his motion to strike the death penalty, the Nevada Supreme Court had interpreted the relevant statutory provisions to require that "[t]o obtain a death sentence, the State must prove *beyond a reasonable doubt* that at least one aggravating circumstance exists and

that the aggravating circumstance or circumstances outweigh any mitigating evidence." *Gallego v. State*, 23 P.3d 227, 239 (Nev. 2001) (en banc) (emphasis added); *see also Johnson v. State*, 59 P.3d 450, 460 (Nev. 2002) (per curiam) ("[The] finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that it is in part a factual determination, not merely discretionary weighing. . . . [W]e conclude that *Ring* requires a jury to make this finding as well: 'If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury *beyond a reasonable doubt*.' " (quoting *Ring v. Arizona*, 536 U.S. 584, 602 (2002) (emphasis added)); *Witter v. State*, 921 P.2d 886, 896 (Nev. 1996) (per curiam) ("[W]e read NRS 200.030(4) as stating that the death penalty is an available punishment only if the state can prove *beyond a reasonable doubt* at least one aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating evidence offered by the defendant." (emphasis added)), *abrogated on other grounds by Byford v. State*, 994 P.2d 700 (Nev. 2000).

Accordingly, we were surprised to learn that the Nevada Supreme Court issued a decision on July 23, 2009 in which it stated that "[n]othing in the plain language of [the relevant statutory] provisions requires a jury to find, or the State to prove, *beyond a reasonable doubt* that no mitigating circumstances outweighed the aggravating circumstances in order to impose the death penalty" and that the court itself "has imposed no such requirement." *McConnell v. State*, 212 P.3d 307, 314-15 (Nev. 2009) (per curiam) (emphasis added). Although we heard oral argument in this appeal approximately two weeks after *McConnell* was decided, the District Attorney of Clark County failed to advise us of the case, and in fact did not do so until January 19, 2010, approximately five months later, after we had issued our decision. In fact, it did not do so until it filed a petition for rehearing en banc.

Even after the Nevada Supreme Court's *McConnell* decision, it remains beyond dispute that a defendant cannot be sentenced to death under Nevada law if a jury finds that the mitigating circumstances outweigh the aggravating circumstances. Such a finding establishes an acquittal of the death penalty for purposes of the Double Jeopardy Clause, regardless of what burden of proof applies. Accordingly, this case does not require us to resolve the question whether the "beyond a reasonable doubt" standard applies to that finding, and we now issue a superseding opinion to make clear that our opinion does not do so. The superseding opinion is, of course, the operative and controlling opinion for all purposes.

The prior opinion in this case is hereby withdrawn, and is replaced with the superseding opinion filed concurrently with this order. The pending petition for rehearing en banc is dismissed as moot. The panel will entertain any petition for rehearing or rehearing en banc filed in accordance with the applicable rules.

---

**OPINION**

REINHARDT, Circuit Judge:

A jury may have acquitted James Harrison of the death penalty. We will never know, because the trial court denied his request to ask the jury two simple questions that could have conclusively established that fact, and instead dismissed the jurors. Now, the State of Nevada seeks once again to have him executed. Harrison asserts that a retrial on the death penalty would violate the Double Jeopardy Clause.

The State prosecuted Harrison for murder, and the jury returned a guilty verdict. The State then sought the death penalty, which required proof of two additional facts beyond guilt: that at least one aggravating circumstance existed, and

that there were no mitigating circumstances sufficient to outweigh the aggravating circumstances. Nev. Rev. Stat. § 175.554(3). The jury was permitted to impose a sentence of death only if it made both findings unanimously. *Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000) (en banc). If it made both findings, it also had the option to sentence the defendant to a non-capital sentence: life without parole, life with parole, or a fixed term with parole. Nev. Rev. Stat. § 200.030(4). If the jury determined that the there were no aggravating circumstances or that there were mitigating circumstances sufficient to outweigh any aggravating circumstances, it was free to choose only one form or another of the three non-capital sentences. *Id.*

The jury reported its inability to agree on a sentence, and two juror notes indicated that the jury was deadlocked between life with the possibility of parole and life without the possibility of parole. Harrison requested that the members of the jury be polled to determine (1) whether they had unanimously found that there were no aggravating circumstances and (2) whether they had unanimously found that the mitigating circumstances outweighed the aggravating circumstances. If the answer to either of the questions had been yes, the poll would have established that Harrison had been acquitted of the death penalty, and the Double Jeopardy Clause of the Fifth Amendment would have prohibited the State from seeking that penalty during Harrison's sentencing retrial. However, the prosecution objected to Harrison's request, and trial judge denied it. She then dismissed the jury and declared a mistrial.

We conclude that there was no manifest necessity to declare a mistrial without first polling the jury in order to determine whether Harrison had been acquitted of the death penalty. Accordingly, we hold that the trial court abused its discretion by denying Harrison's polling request. Because no other alternative would adequately protect Harrison's rights under the Double Jeopardy Clause, we further hold that the

State may not seek the death penalty at a sentencing retrial, and no such penalty may be imposed by the court.[2]

## I. Factual and Procedural Background

In 2002, Harrison and Anthony Prentice were charged by the State of Nevada with conspiracy to commit murder, burglary, and murder with the use of a deadly weapon in connection with the death of Daniel Miller, Prentice's roommate. The State sought the death penalty against both defendants. The trials were severed, and Prentice was convicted of conspiracy to commit murder and murder with use of a deadly weapon and sentenced to life without parole. Subsequently, a different jury found Harrison guilty of the same charges.

Nevada law provides that Harrison's crime may be punished by death, life without parole, life with parole eligibility, or a definite term with parole eligibility. Nev. Rev. Stat. § 200.030(4). For the jury to impose death, two conditions must be met: first, the jury must unanimously find at least one aggravating circumstance; and second, the jury must unanimously find that the mitigating circumstance(s) do not outweigh the aggravating circumstance(s). *Id.*; *see also Hollaway v. State*, 6 P.3d 987, 996 (Nev. 2000) (en banc). If both conditions are met, the jury may choose to impose the death penalty, or may select a lesser sentence. If *either* condition is *not* met, the jury may *not* impose a death sentence. Nev. Rev. Stat. § 175.554(3).

During the penalty stage of Harrison's trial, the jury informed the court that, after deliberating at length, it could

---

[2]Although, for convenience, we refer throughout this opinion to a possible sentencing retrial, we express no view as to how, under Nevada law, a new non-death penalty sentence shall be determined, whether by a jury or the court. We think it likely, however, that the sentencer would be free to impose any of the three sentences that the jury could have imposed once it eliminated the death penalty. *See* pages 2777 *infra*; Nev. Rev. Stat. §§ 175.554(3), 200.030(4).

not reach a unanimous verdict. The court received "two notes from two different jurors indicating that the jury was deadlocked between life with [the possibility of parole] and life without [the possibility of parole]."[3] The judge expressed her inclination to bring the jury back and determine whether further deliberation would be fruitful, and to dismiss the jury in the event that it would not. One of Harrison's attorneys intervened:

> I'd request that we inquire from the jurors how far along in the process that they were in this penalty phase, and by that I mean . . . they needed to make a determination if the aggravators were proved beyond a reasonable doubt. I would ask that this Court inquire of that.
>
> And then the second issue was if the weighing process between the aggravators and mitigators if they had in fact done a weighing process, and I'd ask that this Court poll the 12 individual jurors and ask them individually if any of them made the determination that the mitigation outweighed the aggravations in this matter.

The prosecution opposed polling the jury on the ground that several Nevada statutes allegedly precluded the court from doing so,[4] and argued that "[t]he only way to make any

---

[3]While the trial judge stated that the notes would "be made a court exhibit," they are not in the record before us. The reason, according to the State, is that "Harrison has never before raised the issue of the juror notes . . . [and] because this issue was not previously raised in the case, the two juror notes in question are not part of the appellate record for review by this Court." However, in the transcripts of the penalty phase proceedings that *are* in the record, the trial judge plainly states that these notes exist, and the State does not assert otherwise.

[4]The cited statutes are as follows:

Nev. Rev. Stat. § 50.065. Competency: Juror as witness.

determination as to which verdicts they reached or a partial verdict that may have been reached in this case is to look at the verdict form."

The court did not expressly deny defense counsel's requests to poll the jury, but impliedly agreed with the prosecution's argument. The court explained that if the special verdict forms reflected that the jury had found no aggravators, then "the State would be precluded from seeking the death penalty in a subsequent hearing." As to whether the jury had made a deter-

---

    1.   A member of the jury shall not testify as a witness in the trial of the case in which he is sitting as a juror. If he is called to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.

    2.   Upon an inquiry into the validity of a verdict or indictment:

        (a)   A juror shall not testify concerning the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.

        (b)   The affidavit or evidence of any statement by a juror indicating an effect of this kind is inadmissible for any purpose.

Nev. Rev. Stat. § 175.531. Polling jury; further deliberation or discharge.

    When a verdict is returned and before it is recorded the jury shall be polled at the request of any party or upon the court's own motion. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberation or may be discharged.

Nev. Rev. Stat. § 175.556 Procedure when jury unable to reach unanimous verdict.

    1.   In a case in which the death penalty is sought, if a jury is unable to reach a unanimous verdict upon the sentence to be imposed, the district judge who conducted the trial or accepted the plea of guilty shall sentence the defendant to life imprisonment without the possibility of parole or impanel a new jury to determine the sentence.

mination regarding the relative weight of the mitigators and aggravators, the court said: "The only way for us to know that is to see what form is actually filled out. I suspect, of course, neither form is going to be filled out because they're dead-locked on the punishment."

When the jury returned, the court inquired whether further deliberations would be productive, and the foreperson responded that they were "at an impasse." The court then col-lected all of the special verdict forms. Two were completed and signed (*i.e.,* unanimously agreed-upon). One completed and signed form reflected that the jury found that one aggra-vating factor — that "[t]he murder involved mutilation of the victim" — had "been established beyond a reasonable doubt." The other completed and signed form reflected that the jury had found no fewer than twenty-four mitigating factors.

The other two forms were blank. The first was to be com-pleted if the jury had arrived at its sentence; it was to be used only if the jury found that the aggravating circumstance(s) outweighed any mitigating circumstance(s), and it contained all four sentencing options. The second form was also to be completed if the jury had arrived at its sentence; it was to be used only if the jury found that the mitigating circumstance(s) outweighed the aggravating circumstance(s), and it contained three non-death sentencing options. Each of the two uncom-pleted forms contained a blank line next to each sentencing option, allowing the jury to indicate that it had chosen that option, a blank line allowing the jury to indicate the date, and a blank line for the foreperson's signature; but each was to be filled out only if the jury had decided on the sentence. The jury was not furnished with any form that was to be used to report a finding as to whether the mitigating circumstances outweighed the aggravating circumstances, or vice versa, in the absence of an agreement upon a sentence.

After collecting the forms, the court dismissed the jury and declared a mistrial without conducting the inquiry that Harri-

son had requested.[5] Six months later, before the second penalty phase was scheduled to begin, Harrison made a motion to strike the death penalty. He stated that the members of the jury had "decided, twelve to zero, against the use of the death penalty because they had each independently determined that Harrison's mitigating circumstances outweighed the aggravating circumstances of his crime." He also argued that he had "insisted upon finding out whether or not the jury had reached a unanimous decision as to the death penalty, but the [trial] court denied his request to make further inquiry of the jury." He asserted that the Double Jeopardy Clause "entitled [him] to establish the record of the jury's verdict so that his rights could be protected."

Harrison also introduced three affidavits from former members of the jury, taken after they had been dismissed. The three affidavits state that, during the penalty phase deliberations, the jury had voted 12-0 that death was "off the table." The three jurors stated that "if [they] had been polled by the Court before being excused from service, [they] would have answered that [they] had determined that the mitigating circumstances outweighed the aggravating circumstance." The jury, they explained, was at an impasse between life with the possibility of parole and life without, and the last vote taken was 9-3 in favor of life without.

The State responded by arguing that the jury found Harrison guilty of murder plus an aggravating circumstance beyond a reasonable doubt, and simply had not decided which of the available sentences to impose. The State submitted another

---

[5]The court neither polled the individual jurors nor asked the foreperson whether the jury had reached a unanimous determination regarding Harrison's eligibility for the death penalty. Nonetheless, the State "disputes that Harrison's request for polling was denied." The record plainly belies this assertion. Harrison made the request, the prosecution opposed the request, and the court did not conduct the requested inquiry. Moreover, in its briefs in state court, the State acknowledged that "[t]he Court denied Defendant's request, and the jury was dismissed."

affidavit from a former member of the jury, which stated that, for her, "[t]he death penalty was never 'off the table' as a potential punishment option."

The state court denied Harrison's motion to strike the death penalty. Harrison petitioned the Nevada high court for a writ of mandamus, which was denied without explanation.[6] He next petitioned the United States District Court in Nevada for a writ of habeas corpus under 28 U.S.C. § 2241. He argued that the jury had acquitted him of the greater, death-penalty-eligible, offense, and that retrial on the death penalty would constitute double jeopardy. He further argued that he "had the constitutional right to have the jury polled in order to determine whether the jurors had reached a unanimous decision regarding the death penalty so that his rights against double jeopardy could be preserved."

The district court denied Harrison's petition, finding that nothing before it constituted an acquittal of the death penalty, and that double jeopardy was not implicated. The district court did not address whether the trial court abused its discretion by denying Harrison's polling request. Harrison appeals.

## II.   Jurisdiction and Standard of Review

**[1]** The federal courts have jurisdiction to grant a petition for habeas corpus when the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c). "[A] habeas petition raising a double jeopardy challenge to a petitioner's pending retrial in state court is properly treated as a petition filed pursuant to 28 U.S.C. § 2241." *Wilson v. Belleque*, 554 F.3d 816, 821 (9th Cir. 2009) (citing *Stow v. Murashige*, 389 F.3d 880, 885 (9th Cir. 2004)).

---

[6]The Nevada Supreme Court stated only that its "intervention by way of extraordinary writ [was] not warranted."

The State acknowledges that § 2241 creates jurisdiction over pretrial double jeopardy claims, but notes that Harrison's claim pertains "not to a charge for which he is being detained pre-trial, but only as to one of several potential sentencing options at a re-sentencing hearing." Because "Harrison makes no challenge to the jury's verdict of guilty of first degree murder for which he is being detained," the State argues, we lack jurisdiction to hear his claim.

Our decision in *Wilson v. Belleque*, 554 F.3d 816 (9th Cir. 2009), and the Supreme Court decisions discussed in that opinion, compel us to reject the State's argument. In *Wilson*, the petitioner challenged his pending retrial in state court on double jeopardy grounds. *Id.* at 821. At the time, Wilson was incarcerated as a result of two prior convictions, neither of which he challenged in his habeas petition. *Id.* We were therefore required to determine "whether the current 'in custody' jurisprudence should be construed to include circumstances where the sovereign seeking to prosecute a petitioner is currently detaining the petitioner based on convictions or charges not being challenged." *Id.* at 822. We answered that question in the affirmative, noting that the Supreme Court "has construed the phrase 'in custody' very broadly" in the habeas context. *Id.* We found it particularly relevant that the Court had recognized federal jurisdiction over habeas claims based on future as well as present confinement. *Id.* (citing *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 488-89 (1973)). In light of that precedent and its underlying policy "of encouraging prompt resolution of federal constitutional claims," we concluded that we had jurisdiction to hear Wilson's claim under § 2241. *Id.* at 824.

**[2]** Just as Wilson brought a double jeopardy challenge to a pending retrial while incarcerated as a result of unchallenged prior convictions, Harrison brings a double jeopardy challenge to a pending retrial while incarcerated as a result of a guilty verdict that he does not presently challenge. Although *Wilson* involved a double jeopardy challenge to a pending

guilt phase retrial rather than a pending capital sentencing retrial, the distinction does not affect our conclusion that we have jurisdiction over Harrison's claim. Trial-like capital sentencing proceedings are fully covered by the Double Jeopardy Clause. *See Bullington v. Missouri*, 451 U.S. 430, 446 (1981). The interests of a capital defendant in not being retried for the death penalty are at least as strong as the interests of any other defendant in not being retried for a lesser offense. *Id.* at 445. Accordingly, if the Double Jeopardy Clause prohibits the State from seeking the death penalty at Harrison's sentencing retrial, allowing capital sentencing proceedings to go forward would create a "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c). The interpretation of § 2241 urged by the State would create federal jurisdiction to prevent double jeopardy violations in the context of a guilt phase retrial, but not in the context of a capital sentencing retrial to which the same protections apply. We do not believe that Congress would have intended such an anomalous result. We therefore conclude that we have jurisdiction under § 2241 to reach the merits of Harrison's claim.

We next address whether the requirements imposed by the Antiterrorism and Effective Death Penalty Act of 1996 apply to this appeal. *See* Pub. L. No. 104-132, Title I, § 104, 110 Stat. 1218. When a petitioner is "in custody pursuant to the *judgment* of a State court" (emphasis added), 28 U.S.C. § 2254 limits the authority of federal courts to grant habeas relief. *See White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004). However, if no valid judgment of conviction is in place, § 2254 does not apply. *Murashige*, 389 F.3d at 888. Here, no judgment of conviction has been entered against Harrison. Indeed, no valid judgment of conviction *could* have been entered at this stage, because Nevada law requires such a judgment to set forth "the adjudication and sentence" in addition to the verdict. *See Petrocelli v. Angelone*, 248 F.3d 877, 891 (9th Cir. 2001) (citing Nev. Rev. Stat. § 176.105(1)). Accordingly, Harrison is not "in custody pursuant to the judg-

ment of a State court," and the requirements imposed by § 2254 do not apply to his habeas petition.

Another AEDPA provision requires that a habeas petitioner seeking review of "the final order in a habeas corpus proceeding in which the detention complained of arises out of *process* issued by a State court" must obtain a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A) (emphasis added). We have held this requirement applicable to petitions brought under 28 U.S.C. § 2241(c)(3). *Wilson*, 554 F.3d at 825. Harrison has satisfied this requirement, as he obtained a Certificate of Appealability from this court on May 21, 2009.

**[3]** The deferential standards of review imposed by AEDPA do not apply to § 2241 petitions. *Wilson*, 554 F.3d at 828 (citing *Murashige*, 389 F.3d at 888). "We review de novo a district court's decision granting or denying a petition for a writ of habeas corpus filed pursuant to § 2241." *Id.* (citing *Angulo-Dominguez v. Ashcroft*, 290 F.3d 1147, 1149 (9th Cir. 2002)).

Having established our jurisdiction over this claim, and bearing in mind the appropriate standard of review, we turn now to the merits of Harrison's habeas corpus petition.

## III.  Discussion

In the habeas petition presented to the district court, Harrison originally raised two separate arguments in support of his claim that the Double Jeopardy Clause would be violated if the State were permitted to seek the death penalty at his pending sentencing retrial. First, Harrison argued that the original trial jury had acquitted him of the death penalty. Second, Harrison argued that the trial court abused its discretion by declaring a mistrial, because there was no manifest necessity to do so without first granting Harrison's request to poll the jury concerning their verdict as to the death penalty. Although Harrison no longer contends that the record establishes an

implied acquittal of the death penalty, the two issues are inter-related, such that an explanation of why the implied acquittal claim fails is necessary to the explanation of why the manifest necessity claim succeeds. Accordingly, we address both issues.

## A. Implied Acquittal

**[4]** The Double Jeopardy Clause states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has explained the values underlying this requirement:

> [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187-88 (1957). These values "are equally applicable when a jury has rejected the State's claim that the defendant deserves to die." *Bullington v. Missouri*, 451 U.S. 430, 445 (1981).

Notwithstanding the text of the Double Jeopardy Clause, not all retrials create a double jeopardy violation. Rather, "the law attaches particular significance to an acquittal." *United States v. Scott*, 437 U.S. 82, 91 (1978). A defendant cannot be retried for an offense of which he has been expressly acquitted, through a not guilty verdict, or impliedly acquitted, through a guilty verdict on a lesser included offense that occurs after the jury has had a full and fair opportunity to reach a verdict and has not reported deadlock on the greater offense. *Brazzel v. Washington*, 491 F.3d 976, 981 (9th Cir. 2007) (citing *Green*, 355 U.S. at 191).

**[5]** The Double Jeopardy Clause applies to capital sentencing proceedings that "have the hallmarks of the trial on guilt or innocence." *Bullington*, 451 U.S. at 439. Those hallmarks include a hearing held separately from the guilt phase, legal standards constraining the jury's choice among sentencing options, and a requirement that the prosecution must prove additional facts beyond guilt in order to obtain a sentence of death. *Id.* at 438-39. If a defendant has been acquitted of the death penalty at a trial-like sentencing proceeding, "the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to him, with respect to the death penalty, at his retrial." *Id.* at 446; *see also Arizona v. Rumsey*, 467 U.S. 203, 212 (1984) (reaffirming that, after a defendant is "acquitted" of the death penalty in a capital sentencing proceeding that resembles a trial, he cannot be retried for the death sentence).

**[6]** Although the Double Jeopardy Clause prohibits a capital sentencing retrial after a defendant has been acquitted of the death penalty, imposition of a lesser sentence will not always be interpreted as an implied acquittal of the death penalty.[7] *Sattazahn v. Pennsylvania*, 537 U.S. 101, 107 (2003)

---

[7]If a non-death sentence does not satisfy the standard for establishing an implied acquittal of the death penalty, the absence of an acquittal does not mean that the prosecution can continue to seek the death penalty in spite of the imposition of the lesser sentence. "The double jeopardy clause prohibits additions to criminal sentences in a subsequent proceeding where the legitimate expectation of finality has attached to the sentence." *Stone v. Godbehere*, 894 F.2d 1131, 1135 (9th Cir. 1990) (citing *United States v. DiFrancesco*, 449 U.S. 117, 139 (1980)). State sentencing law constitutes one potential source of such a legitimate expectation. *Id.* Under Nevada law, a sentence becomes final when the judgment is signed by the judge and entered by the clerk. *Miller v. Hayes*, 604 P.2d 117, 118 (Nev. 1979) (citing Nev. Rev. Stat. § 176.105). In addition, Nevada law provides that the jury shall have responsibility for sentencing determinations in death penalty cases, unless it cannot unanimously agree upon a verdict. Nev. Rev. Stat. §§ 175.554(2), 175.556(1). The state's sentencing law creates no procedure through which the prosecution or the court may disturb a jury's unanimous decision to impose a sentence of life rather than

(citing *Bullington*, 451 U.S. at 446). Rather, an acquittal will be found only if the lesser sentence resulted from "findings sufficient to establish legal entitlement to the life sentence" — *i.e.,* findings that the prosecution failed to prove the additional facts beyond guilt necessary to create death eligibility, despite having had "one complete opportunity" to do so. *Id.* at 108, 115.

Here, Harrison's sentencing hearing was "comparable to a trial for double jeopardy purposes." *Rumsey*, 467 U.S. at 209. The penalty phase was a separate hearing at which evidence was presented by both sides and the parties made opening and closing statements. The jury did not have unlimited discretion to choose among sentencing options; rather, its discretion to impose the death penalty was strictly constrained by a requirement that it make new findings beyond those required to find guilt.[8] "[A] defendant in Nevada becomes death eligible only after two steps: a finding that at least one aggravator exists and a finding that the mitigating evidence does not outweigh any aggravator or aggravators." *McConnell v. State*, 107 P.3d 1287, 1292 (Nev. 2005) (en banc) (per curiam). *Both*

---

death. Accordingly, a defendant would have a legitimate expectation in the finality of a jury's unanimous decision to impose a non-death sentence unless he affirmatively chose to challenge the sentence or the underlying conviction. *See United States v. Andersson*, 813 F.2d 1450, 1461 (9th Cir. 1987) (A defendant "has no legitimate expectation of finality in the original sentence when he has placed those sentences in issue by direct appeal and has not completed serving a valid sentence.").

[8]In Nevada, if the mitigating circumstances do not outweigh the aggravating circumstances, the death penalty is not mandatory; the jury may at that point choose between death and three different non-capital sentences. Nev. Rev. Stat. § 200.030(4). A lesser penalty of incarceration, however, *is* mandatory if the findings are insufficient to impose death; i.e., if the findings are either that there are no aggravating circumstances or that the mitigating circumstances outweigh the aggravating circumstances. *Id.* § 175.554(3); *see also id.* § 200.030(4)(a). In that case, three different non-capital sentencing options are available to the jury. *Id.* § 200.030(4)(b).

of those findings had to be made by the jury; *neither* could be made by the judge. *Johnson v. State of Nevada*, 59 P.3d 450, 460-61 (Nev. 2002) (per curiam).

**[7]** Because Nevada's capital sentencing laws require "two distinct findings to render a defendant death-eligible," *id.* at 460, a defendant can be acquitted of the death penalty either through a finding that no aggravating circumstance exists, or through a finding that the mitigating circumstances outweigh the aggravating circumstances. Nev. Rev. Stat. § 175.554(3). Although the State argues that the "weighing" determination is "not a finding of fact," the Nevada Supreme Court has held to the contrary:

> [The] finding regarding mitigating circumstances is necessary to authorize the death penalty in Nevada, and we conclude that it is in part *a factual determination, not merely discretionary weighing*. So even though *Ring* expressly abstained from ruling on any "Sixth Amendment claim with respect to mitigating circumstances," we conclude that *Ring* requires a jury to make this finding as well: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt."

*Johnson*, 59 P.3d at 460 (emphasis added) (citing *Ring v. Arizona*, 536 U.S. 584, 597 n.4, 602 (2002)).[9]

We are puzzled by one aspect of the law of Nevada. For years, the Nevada Supreme Court expressly recognized that

---

[9]Because the Nevada Supreme Court held in *Johnson* that the jury's determination as to whether mitigation outweighed aggravation is a factual finding rather than "merely discretionary weighing," the dissent's characterization of that finding as "a profoundly discretionary matter" is incorrect as a matter of Nevada law. *See* dissent at 2812.

"[t]o obtain a death sentence, the State must prove *beyond a reasonable doubt* that at least one aggravating circumstance exists and that the aggravating circumstance or circumstances outweigh any mitigating evidence." *Gallego v. State*, 23 P.3d 227, 239 (Nev. 2001) (en banc) (emphasis added); *see also Johnson*, 59 P.3d at 460 (quoted *supra* p. 2790); *Witter v. State*, 921 P.2d 886, 896 (Nev. 1996) (per curiam) ("[T]he death penalty is an available punishment only if the state can prove *beyond a reasonable doubt* at least one aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating evidence offered by the defendant." (emphasis added)), *abrogated on other grounds by Byford v. State*, 994 P.2d 700 (Nev. 2000). Recently, however, the Nevada Supreme Court stated that "[n]othing in the plain language of [the relevant statutory] provisions requires a jury to find, or the State to prove, beyond a reasonable doubt that no mitigating circumstances outweighed the aggravating circumstances in order to impose the death penalty" and that the court itself "has imposed no such requirement." *McConnell v. State*, 212 P.3d 307, 314-15 (Nev. 2009) (per curiam).[10] In support of that assertion, the court cited only cases decided in and before 1995, and did not acknowledge its contrary decisions issued in and after 1996.

We need not speculate as to what the Nevada Supreme Court will say in the future regarding the applicability of the "beyond a reasonable doubt" standard to the second of the two required findings, because the resolution of that issue has no impact on the outcome of this case. Whatever else it may or may not have done, the recent decision of the Nevada

---

[10]In *McConnell*, a state habeas petitioner brought an ineffective assistance claim "based on appellate counsel's failure to argue that the district court should have instructed the sentencing jury that the aggravating factors had to outweigh the mitigating factors beyond a reasonable doubt before it could impose death." 212 P.3d at 314. The Nevada Supreme Court rejected the claim because it concluded that "the underlying legal argument would not have had a reasonable probability of success on appeal." *Id.*

Supreme Court neither altered the trial-like character of Nevada's capital sentencing proceedings nor eliminated the statutory requirements for death eligibility. A defendant cannot be given the death penalty in Nevada unless the jury finds that the mitigating circumstances do not outweigh the aggravating ones. Nev. Rev. Stat. § 175.554(3). Accordingly, even if the State had no burden at all with regard to that finding, a finding to the contrary, regardless of the burden, would still be "sufficient to establish legal entitlement to the [non-capital] sentence," *Sattazahn*, 537 U.S. at 108, and thus would constitute an acquittal for purposes of the Double Jeopardy Clause.[11]

[8] Here, the jury signed one verdict form indicating that it had found the existence of an aggravating factor, and another indicating that it had found the existence of twenty-four mitigating factors. We therefore know that the jury made one of the two factual findings necessary to establish Harrison's statutory eligibility for the death penalty. However, the verdict forms do not tell us whether or not the jury then found that the twenty-four mitigating factors outweighed the aggravating factor — a finding that would have made him statutorily ineligible for the death penalty. Accordingly, the verdict

---

[11]The State's assertion that the prosecution "bears no burden with regard to the finding of mitigating circumstances or the weighing process" is not only irrelevant, for the reasons explained above, but is refuted by the decisions of the Nevada Supreme Court. *See, e.g., Floyd v. State*, 42 P.3d 249, 258 (Nev. 2002) (en banc) (per curiam) ("The State has the burden of . . . proving that aggravating circumstances exist and are not outweighed by any mitigating circumstances."), *abrogated on other grounds by Grey v. State*, 178 P.3d 154 (Nev. 2008) (en banc); *see also Witter*, 921 P.2d at 896 (rejecting the argument that Nevada's death penalty statute "shifts the burden of proof to the defendant to prove that mitigating circumstances outweigh aggravating circumstances"); *accord Blake v. State*, 121 P.3d 567, 580 (Nev. 2005) (en banc). The recent *McConnell* decision stated only that the State was not required to carry its burden "beyond a reasonable doubt."

forms do not allow us to reach any conclusion as to whether the jury acquitted Harrison of the death penalty.[12]

The notes passed to the trial court by the deadlocked jurors are similarly inconclusive. The notes stated that the jury was hung between life with parole and life without parole, giving rise to the inference that the jury had eliminated the death penalty as a sentencing option. Even if this information conclusively established the status of the jury's deliberations — which it does not, since no official vote was taken or announced in open court — it would not tell us whether the jury favored a penalty other than death as a matter of choice (*i.e.,* despite its finding that the aggravating factor outweighed the mitigating factors), or as a matter of legal obligation (*i.e.,* because it found that the mitigating factors outweighed the aggravating factor).

---

[12]The dissent makes two erroneous assertions about the conclusions that can be drawn based on the verdict forms. First, the dissent states that the "findings reflected on these verdict forms . . . establish [Harrison's] eligibility for [the death penalty.]" Dissent at 2811. The Nevada Supreme Court, however, has held that a defendant is not eligible for the death penalty unless the jury makes the factual determination that mitigating factors did not outweigh aggravating factors. *Johnson*, 59 P.3d at 460. Because no such finding was reported on the verdict forms, this first assertion is incorrect as a matter of Nevada law. Second, the dissent makes the contradictory claim that the verdict forms "reflect[ ] a lack of unanimous agreement about whether or not the aggravation outweighed the mitigation." Dissent at 2811. As we have noted, however, unlike the question whether aggravating and mitigating factors exist and the number of each, nothing on the verdict forms suggested that the jury could report its finding on whether mitigators outweighed aggravators or vice versa in the absence of an agreement upon the ultimate sentence to be imposed. *See supra* at 2780. Accordingly, the verdict forms are entirely consistent with the proposition that the jury had unanimously determined that the mitigating factors outweighed the aggravating factor, thereby acquitting Harrison of the death penalty. They are, of course, also consistent with the proposition that it had not. Only the inquiry of the jury requested by Harrison would have shown which was correct: whether he had been acquitted of the death penalty or not.

**[9]** Considering the record before us,[13] we are left to conclude that it is entirely possible — even likely — that the jury had unanimously agreed that the twenty-four mitigating circumstances outweighed the single aggravating circumstance, and that the jury had therefore made the factual finding that rendered Harrison statutorily ineligible for the death penalty. Still, on the record alone, we have an insufficient basis on which to reach a definitive conclusion. There was, however, a simple way to determine whether the jury had made the critical factual determination. Harrison requested that the jury be polled in order to ask it whether it had determined that the mitigating factors outweighed the aggravating factor. The jury's answer would have established whether it had acquitted him of the death penalty. However, the trial court denied the request, dismissed the jury, and declared a mistrial. Because of the trial judge's decision to declare a mistrial without granting Harrison's polling request, we cannot determine whether the jury acquitted Harrison of the death penalty. Accordingly, his implied acquittal claim must fail.

## B. Manifest Necessity

Had the judge polled the jury before declaring a mistrial, and had the jury announced that it had unanimously found that the mitigators outweighed the aggravator, Harrison would have been unambiguously acquitted of the death penalty, and the State would be barred from seeking that penalty in future sentencing proceedings.[14] Had it answered otherwise, the

---

[13]Harrison has conceded that the juror declarations obtained after trial have no evidentiary weight here, as a matter of law, and that is the State's legal position as well. Accordingly, we do not consider the declarations as part of the record upon which we may base our decision.

[14]Our discussion of polling does not reflect any determination that polling offered the only means of protecting Harrison's double jeopardy rights. Rather, it results from Harrison's specific request that the trial court "poll the 12 individual jurors and ask them individually if any of them made the determination that the mitigation outweighed the aggravations in

State would have been free to seek the death penalty once more. Accordingly, we now turn to the question whether, under these circumstances, the declaration of a mistrial without Harrison's consent constituted an abuse of discretion.[15]

[10] The Double Jeopardy Clause, in addition to "unequivocally prohibit[ing] a second trial following an acquittal[,] . . . . also embraces the defendant's valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (citation and internal quotation marks omitted). At the same time, "a variety of circumstances . . . may make it necessary to discharge a jury before a trial is concluded." *Id.* at 503. When those circumstances do not

---

this matter." The trial court denied that request without offering any alternative means of determining whether Harrison had been acquitted of the death penalty — for example, by asking the foreperson whether the jury had reached unanimous agreement as to whether the mitigators outweighed the aggravators, or by providing the jury with an additional verdict form and allowing it to report whether it had or could resolve that issue without agreeing on a sentence. Should the parties expressly agree to substitute a report by the foreperson for a polling of the jurors by the court, that alternative would certainly be acceptable. Moreover, the parties could, of course, agree to a foreperson's report without waiving their right to an open juror poll by the court. The prosecution has no right, however, to bar a juror poll if requested by the defendant, at least in the absence of some good cause not present here. Of course, if a defendant *consents* to the declaration of a mistrial at any time, including after an inquiry into the status of a jury's deliberations, whether that inquiry involves individual polling or any other procedure, manifest necessity is not required. *See United States v. Scott*, 437 U.S. 82, 93 (1978).

[15]Our analysis is simplified by the fact that the court was informed before it dismissed the jury of the answer to the first question that could have determined that Harrison could not be tried a second time on the issue of the death penalty. The jury had answered that question, whether an aggravating circumstance existed, adversely to Harrison, thus leaving only the answer to the second question to inform the court whether the jury had decided that the State had failed to prove that Harrison was death-eligible. Accordingly, although Harrison asked that the jury be polled on both questions, we will hereafter discuss only the second.

result in unfairness to the defendant, a trial court may exercise its discretion to declare a mistrial, and a subsequent prosecution will not violate the Double Jeopardy Clause. *Id.* at 505. However, because of the importance of a defendant's right to a single trial, a declaration of a mistrial violates a defendant's double jeopardy rights if it is done without his consent, unless there is a "manifest necessity" for the court's action. *Id.*

**[11]** A jury's inability to reach a verdict can, in some circumstances, create "manifest necessity" for declaring a mistrial. *Id.* While an appellate court owes "great deference" to a trial court's decision to declare a mistrial because of a hung jury, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Id.* at 510 n.28.

**[12]** Here, the question is not whether the trial court abused its discretion in determining, based on the verdict forms and the colloquy with the foreperson, that the jury had reached an impasse as to the sentence to be imposed. The jury's failure to agree upon a sentence provides no information about whether it had acquitted Harrison of the death penalty by unanimously reaching a final determination that, under the facts as it had found them, he was statutorily ineligible for that penalty.[16] As we have explained, *see supra* at 2793, there is a substantial possibility that the jury had already resolved that preliminary question in Harrison's favor after it had first determined that there were twenty-four mitigating factors and

---

[16]The colloquy between the trial court and the foreperson addressed only whether the jury could reach an agreement as to the ultimate sentence to be imposed, and not whether the jury had already resolved the preliminary factual questions that determined Harrison's statutory eligibility for the death penalty. Accordingly, *United States v. Cawley*, 630 F.2d 1345 (9th Cir. 1980), cited by the dissent, is inapposite. *Cawley* addressed the difference between questioning the foreperson and polling each juror individually. Here, however, the trial court did not poll the jurors *or* ask the foreperson whether the jury had acquitted Harrison of the death penalty.

one aggravating one. Accordingly, the issue presented in this case is not whether the judge should have declared a mistrial at all, but whether the mistrial should have been declared without first honoring Harrison's request to ask whether the jury had acquitted him of the death penalty. If there was no manifest necessity to dismiss the jury without asking it whether it had done so, the trial court abused its discretion by declaring a mistrial in violation of the rights guaranteed to Harrison under the Double Jeopardy Clause.[17]

### 1.

We first examine the Nevada statutes cited by the prosecution in opposition to Harrison's polling request. As explained below, our decision does not examine the validity of those statutes, because none posed any barrier to the granting of Harrison's request.

The first statute cited by the prosecution prohibits asking a juror about "the effect of anything upon his or any other

---

[17]The district court did not address this issue in its decision denying Harrison's habeas petition. The State contends that the issue "[has] not been squarely raised in this case until now and [has] not been previously addressed by any court below." Harrison did, however, raise these issues both in the state courts and the federal district court. In his Motion to Strike, he argued that the members of the jury "had each independently determined that [his] mitigating circumstances outweighed the aggravating circumstances of his crime" and that the Double Jeopardy Clause "entitled [him] to establish the record of the jury's verdict so that his rights could be protected." Before the Nevada Supreme Court, he argued that the jury had "determined that the mitigation evidence outweighed the aggravation evidence" and that "[u]nder the Fifth and Fourteenth Amendments, [he] was entitled to establish the record of the jury's verdict so that his rights could be protected." In the habeas petition presented to the district court, he argued that the jury "unanimously concluded that the mitigating factors outweighed the one aggravating factor" and that he "was entitled to establish the record concerning the jury's verdict so that his Double Jeopardy rights could be protected." We conclude that the issue was squarely and adequately raised below.

juror's mind or emotions as influencing him to assent or to dissent from the verdict or indictment or concerning his mental processes in connection therewith." Nev. Rev. Stat. § 50.065. Harrison requested a poll as to the jury's conclusion about his statutory eligibility for the death penalty. This was an objective question about whether the jury had resolved an issue that it was required to resolve, not an inquiry into the jury's emotions or thought processes in reaching its conclusions. Accordingly, the trial court would not have violated this statute by granting Harrison's polling request.

The second statute cited by the prosecution requires the jury to be polled at the request of any party, or by the court *sua sponte*, after the jury returns a verdict. Nev. Rev. Stat. § 175.531. The statute does not state that *only* post-verdict polling is permissible, and therefore would not have prohibited the judge from polling the jurors after they had reported their inability to reach a sentencing decision.

The third and final statute sets forth the procedure to be followed when a jury is unable to reach a unanimous sentencing decision in a capital case. Nev. Rev. Stat. § 175.556(1). When that situation occurs, "the district judge who conducted the trial or accepted the plea of guilty shall sentence the defendant to life imprisonment without the possibility of parole or impanel a new jury to determine the sentence." *Id.* In Harrison's case, the judge chose the latter option. Nothing in the statute, however, precluded the judge from conducting a poll, before discharging the initial jury, in order to determine either whether it was actually deadlocked or whether Harrison had been acquitted of the death penalty so that only the non-death sentencing options would be submitted to the new jury.

**[13]** "A court abuses its discretion when it rests its decision on an inaccurate view of the law." *United States v. Jones*, 472 F.3d 1136, 1141 (9th Cir. 2007) (citing *United States v. Garcia*, 401 F.3d 1008, 1011 (9th Cir. 2005)). Although it is clear that the statutes cited by the prosecution did not preclude

the trial court from honoring Harrison's polling request, and that the prosecution's view of the law was erroneous, the record does not make clear whether the trial court relied on the cited statutes in denying the request. The judge's response to the parties' arguments about polling does not state why she believed that she was not permitted to make any inquiry that went beyond the verdict forms, whatever the reason for her belief:

> The problem is if they found that the — if they found aggravators and they found mitigators, until they actually fill out one of the two verdict forms indicating the penalty, we don't know what their weighing analysis was because there's nothing on the mitigating form to say the jury having found these mitigators finds the mitigators outweigh the aggravators or the aggravators outweigh the mitigators. *The only way for us to know that is to see what form is actually filled out.* I suspect, of course, neither form is going to be filled out because they're deadlocked on the punishment.
>
> What we don't know is whether or not they have in fact by virtue of the fact they're not considering the death penalty or at this point in time are not tied between some with the death penalty, that doesn't tell us where they are in terms of the aggravators and the mitigators.

As explained below, the court was clearly in error. There *was* a way for it to determine whether the jury had acquitted Harrison of the death penalty. In fact, the court not only was permitted but *required* to honor his request to determine whether the jury had done so. By denying the polling request on the basis that the verdict forms provided "[t]he only way for us to know" what the jury decided, the judge relied upon an erroneous interpretation of the law, believing that her discretion to inquire into the jury's findings was constrained. Because

the judge failed to explain why she concluded that there was no way to determine whether the jury had "acquitted" Harrison of the death penalty, we will explain below why her conclusion was legally erroneous and why she was obligated to grant Harrison's counsel's request.

## 2.

**[14]** The specific issue before us — whether the trial judge in a capital case is required to grant a request to poll the jury when it may have reached a unanimous determination that the defendant was statutorily ineligible for the death penalty — has rarely reached the courts.[18] The Nevada Supreme Court may have addressed this issue in *Daniel v. State of Nevada*, 78 P.3d 890 (Nev. 2003). In that case, the defendant was found guilty, and the jury was unable to reach a verdict during the penalty phase. *Id.* at 896. The defendant argued that the trial court erred by "refusing to poll the jury to determine if the jury had unanimously rejected death and had deadlocked on a lesser sentence." *Id.* That question is of course broader than the question before us: whether the jury had unanimously found that the mitigating factors outweighed the aggravating factor. In any event, the Nevada state court rejected the defendant's argument with only a conclusory statement and no explanation:

> Appellant asserts that before dismissing the jurors the district court should have granted his request to poll them to determine whether they had unani-

---

[18]This is due in part to the uniqueness of Nevada's capital sentencing scheme. Only 35 states have the death penalty to begin with. In 28 of those states, either the ultimate decision to impose the death penalty is not made by the jury, or there are only two sentencing options, so that a hung jury necessarily reflects an absence of unanimity as to the death penalty. Three states and the federal system have safety-valves wherein if a jury cannot reach a unanimous decision, a lesser sentence must be imposed by the court. Nevada is one of only four jurisdictions in which the circumstances present in Harrison's case could possibly arise.

> mously rejected death and were deadlocked over a lesser sentence. Because appellant argues that imposition of the death penalty after remand and retrial would violate the Double Jeopardy Clause, we reach this issue and conclude that the district court was not required to poll the jurors. *Cf. People v. Hickey*, 103 Mich.App. 350, 303 N.W.2d 19, 21 (1981); *A Juvenile v. Com.*, 392 Mass. 52, 465 N.E.2d 240 (1984).

*Id.* at 906 (footnoted citation included as main text). As we explained earlier, the jury could have rejected the death penalty even if it had made the two factual findings that rendered the defendant eligible for a capital penalty. Thus, the answer to the question whether the jury rejected the death penalty would not have answered the question whether the jury had found the defendant statutorily ineligible for the death penalty. The Nevada court could have rejected the defendant's appeal on the ground that the requested polling could not have established the acquittal necessary to trigger double jeopardy protections. Primarily for this reason, but also because *Daniel* does not state whether it is construing Nevada's double jeopardy clause or the double jeopardy clause of the Fifth Amendment, we are unable to conclude that the Nevada Supreme Court has previously interpreted the United States Constitution with respect to the question now before us.[19]

A number of courts have addressed the issue that arises when a greater offense and lesser included offenses are submitted to a jury, the jury reports its inability to reach a verdict, and the defendant seeks to establish whether the jury has unanimously agreed on acquittal of the greater offense. Courts have split as to whether a trial court facing that situation abuses its discretion by declaring a mistrial without allowing

---

[19]In *Harrison*, the Nevada Supreme Court reached the equally unhelpful conclusion that its "intervention by way of extraordinary writ [was] not warranted." This tells us little or nothing as to whether the court considered, let alone decided, the question we must answer here.

the defendant to create a record of the jury's decision as to the greater offense.

A New Hampshire Supreme Court decision typifies the reasoning of courts holding that a trial court must grant a defendant's request to poll a hung jury in order to determine whether it has acquitted the defendant of the greater offense. The court framed the question as "whether, without first inquiring what the jury had in fact done, there was a 'manifest necessity' to declare a mistrial or whether the ends of public justice would otherwise be defeated if the trial court failed to discharge the jury." *State v. Pugliese*, 422 A.2d 1319, 1320-21 (N.H. 1980) (per curiam). Deciding the case under the double jeopardy clause of the New Hampshire constitution, the court answered that question in the negative and held that a retrial on the greater offense was barred:

> Not only did the trial court fail to expressly find a manifest necessity, but no such necessity could have been found. Nor would the ends of public justice have been defeated by simply asking the jury if they had reached a verdict on the [greater] charge. If the answer had been in the negative, there would then have been a basis for the mistrial. If the answer had been that the jury had agreed on acquittal, then the defendant's "valued right" would have been upheld. There was no necessity at all, much less a high degree of necessity, to declare a mistrial before making the inquiry requested. All possible alternatives to a mistrial must be considered, employed and found wanting before declaration of a mistrial over the defendant's objection is justified. That was not done in this case.

*Id*. at 1321 (citations omitted); *see also Wallace v. Havener*, 552 F.2d 721, 724 (6th Cir. 1977) ("There is no acceptable reason why the state should have a second opportunity to convince a jury of facts necessary to secure a conviction of a

crime."); *Stone v. Superior Court*, 646 P.2d 809, 820 (Cal. 1982) ("[T]he trial court is constitutionally obligated to afford the jury an opportunity to render a partial verdict of acquittal on a greater offense when the jury is deadlocked only on an uncharged lesser included offense. Failure to do so will cause a subsequently declared mistrial to be without legal necessity.").

In *People v. Hickey*, 303 N.W.2d 19 (Mich. App. 1981), the Michigan Court of Appeals reached the opposite conclusion. The court determined that "polling the jury on the various possible verdicts submitted to it would constitute an unwarranted and unwise intrusion into the province of the jury." *Id.* at 21. The court also expressed the concern that "jury votes on included offenses may be the result of a temporary compromise in an effort to reach unanimity." *Id.*; *accord A Juvenile v. Commonwealth*, 465 N.E.2d 240, 244 (Mass. 1984).

**[15]** We are persuaded by the reasoning of the cases decided in favor of granting a defendant's polling request, and certainly in a capital case. We believe that the cases give appropriate weight to a defendant's "valued right to have his trial completed by a particular tribunal," *Washington*, 434 U.S. at 503, and recognize that there can be no "manifest necessity" for declaring a mistrial without allowing the defendant the opportunity to establish whether he has been acquitted of a charge brought against him.

The concerns expressed in the cases that disfavor polling are simply too insubstantial to outweigh the countervailing risk that a defendant will be subjected to a second trial for an offense of which he has already been acquitted. A jury poll, when conducted in open court and with proper instructions, does not create a risk that a juror's temporary compromise vote will be erroneously treated as a final conclusion. When the pressure to compromise is a concern, courts have recognized that polling is the solution, not the problem. "Polling is useful to indicate an irregularity in a verdict." *United States*

*v. Paniagua-Ramos*, 135 F.3d 193, 199 (1st Cir. 1998) (citing *Siverson v. O'Leary*, 764 F.2d 1208, 1219-20 (7th Cir. 1985)). This is because a poll places the members of a jury "in a situation (i.e., polling in open court) that allows them to be free of jury-room coercion." *United States v. Williams*, 990 F.2d 507, 512 (9th Cir. 1993). Moreover, any concern about tentative findings can be resolved by simply instructing the members of the jury to answer the polled question in the affirmative only if they have reached a final conclusion. *See also supra* note 14.

Under the circumstances of this case, the concern about temporary compromise votes carries even less weight than in other contexts. Harrison sought to poll the jury as to whether it had found that the mitigating circumstances of his crime outweighed the aggravating circumstance. Under Nevada law, the jury's answer to that question did not affect the availability of any sentence other than death. *See* Nev. Rev. Stat. § 200.030(4); *id.* § 175.554(3). A vote that the mitigating circumstances outweighed the aggravating circumstance would thus have little value as a temporary compromise, because unanimous agreement on that issue would eliminate death as a possible penalty without bringing the jury any closer to agreement on a particular non-death sentence.[20] When asked in open court whether the juror had reached a final conclusion that the mitigating circumstances of Harrison's crime outweighed the aggravating circumstance, we can see no reason for a juror to respond with an affirmative answer unless the juror had actually concluded with finality that Harrison was statutorily ineligible for the death penalty.

---

[20]When reporting a non-death sentence, the jury would have had to choose between one form stating that "the aggravating circumstance or circumstances outweigh any mitigating circumstance or circumstances" and another stating that "the mitigating circumstance or circumstances outweigh any aggravating circumstance or circumstances." However, there is no reason to believe that the decision about which form to use in reporting a non-death sentence would bring the jury any closer to a decision about which non-death sentence should be imposed.

Nor do we believe that the requested inquiry would impermissibly invade the province of the jury. Courts are permitted to make "brief and objective inquiries into the status of jury deliberations." *United States v. Ross*, 626 F.2d 77, 81 (9th Cir. 1980). When a jury announces that it has come to an impasse, asking "whether the jury [has] reached a unanimous verdict on any one count" is permissible. *Id.* at 80. Moreover, a court may ask a jury to clarify an inconsistent or ambiguous verdict. *United States v. McCaleb*, 552 F.3d 1053, 1058 (9th Cir. 2009) (citing *Larson v. Neimi*, 9 F.3d 1397, 1402 (9th Cir. 1993)). There is no relevant distinction between those inquiries and the one at issue here. Whether the jury unanimously found that the mitigators outweighed the aggravators is a single, objective, yes-or-no question that would have been answered by which verdict form was used if the jury had agreed upon a sentence. The requested poll would not have required the members of the jury to reveal their reasons for reaching a particular conclusion, *see United States v. Nelson*, 692 F.2d 83, 85 (9th Cir. 1982), or any other protected aspect of the deliberative process. Rather, it would have elicited clearly permissible information: whether the jury had reached a unanimous decision about one of the factual issues it was required to resolve in the prosecution's favor before it could consider imposition of the death penalty.

**[16]** In summary, the requested poll would have conclusively established whether Harrison had been acquitted of the death penalty without creating a significant risk of giving final weight to a tentative conclusion or intruding upon protected aspects of the deliberative process. Under these circumstances, there was no manifest necessity for declaring a mistrial over the defendant's objection without first polling the jury as to whether it had unanimously found that the mitigating circumstances of his crime outweighed the aggravating circumstance. Accordingly, we hold that the trial court abused its discretion by declaring a mistrial without granting Harrison's polling request.

## C. Future Proceedings

Having concluded that the trial court abused its discretion by declaring a mistrial in the absence of manifest necessity, we must now determine what means are available to ensure that the pending state sentencing proceedings will not violate Harrison's rights under the Double Jeopardy Clause.

**[17]** In the context of a guilt phase trial for related offenses, a double jeopardy violation may bar retrial as to the greater offense, the lesser included offense, or both, depending on the nature of the prejudice to the defendant. *See Brazzel*, 491 F.3d at 986-87; *United States v. Jose*, 425 F.3d 1237, 1241-44 (9th Cir. 2005). Because the Double Jeopardy Clause applies fully to trial-like capital sentencing proceedings, *see Bullington v. Missouri*, 451 U.S. 430, 446 (1981), the same principle applies to the sentencing options available in such proceedings, and a double jeopardy violation may bar retrial for the death penalty while permitting the imposition of another sentence. Here, Harrison was prejudiced by the trial court's erroneous refusal to allow him to establish whether the jury had acquitted him of the death penalty. That error did not cause him any prejudice with regard to the other sentencing options. Accordingly, the requirements of the Double Jeopardy Clause would be satisfied by simply barring the State from seeking the death penalty in any future proceedings, and, of course, barring the courts from imposing that penalty.

Before determining finally that a sentencing proceeding involving only non-death options is the appropriate remedy in this case, however, we explore one alternative means of curing the trial court's failure to honor Harrison's polling request before dismissing the jury. If the original jury could be reconstituted and polled as to whether it had unanimously determined during deliberations that the mitigating circumstances of Harrison's crime outweighed the aggravating circumstance, and if that procedure were adequate to establish a reliable record of its verdict, the prejudice to Harrison would be

removed. Both parties have expressed their opposition to this course of action, and Harrison has argued that it would be contrary to law. For the reasons stated below, we conclude that reassembling the jury would not provide an adequate cure for the trial court's erroneous denial of Harrison's polling request.

We begin by examining whether reconvening Harrison's original jury would be permissible under Nevada law. No Nevada statute expressly allows or disallows reassembly of a jury after it has been discharged, but a Nevada Supreme Court decision sheds considerable light on how the state courts would view such a procedure. In *Davidson v. State of Nevada*, 192 P.3d 1185, 1186 (Nev. 2008), the court considered "whether the district court can change a jury's verdict from not guilty to guilty for a criminal charge based on a purported clerical error after the jury has been discharged." The court acknowledged a Nevada statute providing that "[c]lerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders." *Id.* at 1189 & n.9 (quoting Nev. Rev. Stat. § 176.565). However, the court found the application of that statute to be limited by the Double Jeopardy Clause, which "does not allow the district court to enhance a verdict if the jury has been discharged." *Id.* at 1189. In reaching that conclusion, the court cited *Burchett v. Commonwealth*, 734 S.W.2d 818, 820 (Ky. Ct. App. 1987), for the proposition that "[o]nce a jury is discharged, it cannot reassemble if the jurors have separated and have left the presence of the courtroom." *Davidson*, 192 P.3d at 1189 n.10. Although the court discussed both the Double Jeopardy Clause of the federal Constitution and its counterpart in the Nevada constitution, the court appeared to base its decision on the federal constitutional provision. *Id.* at 1188-89. Accordingly, while *Davidson* advises that the United States Constitution would not allow a jury to be reassembled after it had been discharged, the case does not compel that conclusion as a matter of Nevada state law.

Like *Davidson*, our own precedent strongly suggests that reassembling a jury to report on guilt or innocence is unlawful. "A court treads on dangerous ground when it reassembles the jurors to clarify a verdict after the trial has concluded." *United States v. Boone*, 951 F.2d 1526, 1532 (9th Cir. 1991). With the passage of time, "memories may fail, and in the interim, ex parte contact with former jurors by dissatisfied litigants may encourage jurors to falsify or invent facts." *Id.* (quoting *People v. Romero*, 646 P.2d 824, 829 (Cal. 1982)). In light of the many problems associated with belated jury polls, we concluded in *Boone* that the jury could not be reconvened to clarify a discrepancy between its written and oral verdicts more than two years after the trial had ended. *Id.*

We reached a similar conclusion in *United States v. Washington*, 819 F.2d 221 (9th Cir. 1987). Two years after a jury found the defendant guilty, we determined that the trial court had erred by failing to expose potential juror prejudice during voir dire. *Id.* at 224. The government suggested reassembly of the jury in order to question each juror about the unexamined source of potential prejudice. *Id.* We rejected that suggestion, in part because "[m]emories fade and biases change over time," undermining the reliability of such a procedure. *Id.* We also recognized that reassembling a jury after the passage of two years would involve "manifest difficulties," including the logistical problems involved in locating each of the twelve jurors, and would be a wasted effort if any member of the jury could not be reached. *Id.* at 224-25. Our decision rested largely on such "pragmatic" considerations. *Id.* at 225; *see also United States v. Sweat*, 555 F.3d 1364, 1368 (11th Cir. 2009) (concluding that three months after the jury had been dismissed, reassembly implicated "inherent concerns about recalling and interrogating jurors, plus the likely fogging of memories with the passage of time from the end of the trial").

Other courts have held that a jury may not be reassembled for polling after it has dispersed, citing concerns about the impact of lifting the admonition against discussing the case or

engaging in ex parte contact after the trial has ended. For example, the Seventh Circuit reasoned that even after a single day, a jury "will have been subjected to exposure of outside factors rendering the reliability of any poll on recall problematic." *United States v. Marinari*, 32 F.3d 1209, 1213 (7th Cir. 1994). The court explained:

> [A]fter discharge, the jurors are quite properly free to discuss the case with whomever they choose. Simple questions such as "Did we do alright?" or "We did the right thing, didn't we?"— responded to either positively or negatively would taint any subsequent poll. In any realistic sense, no meaningful poll, unaffected by outside influences, could be conducted at this point.

*Id.* at 1214. The court thus determined that "the jury continued to exist as a judicial body under the control of the court" only during the time that the members of the jury "had not dispersed and . . . remained untainted by any outside contact." *Id.* at 1215; *see also Speaks v. United States*, 617 A.2d 942, 949 (D.C. App. 1992) ("While a poll of the jury immediately after return of a verdict or immediately after a note of deadlock is a commonly accepted procedure, a poll comes too late after the jury has dispersed.").

Here, more than three years have passed since Harrison's original jury was dismissed on November 27, 2006. We are aware of no case, civil or criminal, in which we have allowed a court to reassemble a jury after such a significant passage of time.[21] All of the concerns noted above — the reliability

---

[21]In *E.F. Hutton & Co., Inc. v. Arnebergh*, 775 F.2d 1061, 1063 (9th Cir. 1985), the trial court reconvened the jury several weeks after the close of a civil trial in order to clarify an ambiguity in the verdict. Because the parties had stipulated to that procedure, we allowed the judgment to stand without deciding whether reassembling the jury had been proper. *Id.* at 1064. Here, in contrast, both Harrison and the State have expressed their opposition to reassembling the jury.

problems caused by the fogging of memory over time; the logistical difficulties involved in contacting and reconvening twelve jurors, some of whom may have moved away or died in the interim; and the potential bias introduced by outside influences after the admonition has been lifted — are present in this case.

We are especially concerned that a belated poll of Harrison's original jury would be tainted by outside influences. Because death penalty cases attract a great deal of interest and publicity, we safely assume that most if not all of the jurors read about Harrison's case or discussed it with friends and family after the trial ended. Moreover, because three jurors gave affidavits for the defense and one gave an affidavit for the prosecution, we can be certain that extensive ex parte contact has occurred. Accordingly, even if the logistical problems were resolved such that a poll of the reassembled jury could occur, we have no confidence that the poll would accurately reflect what the jury decided during its deliberations more than three years ago.

**[18]** Under these circumstances, reassembling Harrison's jury for polling would be neither feasible nor adequate to cure the constitutional violation that occurred when the trial court declared a mistrial in the absence of manifest necessity. By failing to honor Harrison's polling request, the trial court deprived him of the only possible means of establishing whether he had been acquitted of the death penalty. Accordingly, we conclude that the State must not be permitted to seek, and the sentencer may not impose, the death penalty against Harrison in any future proceeding relating to the offense on which he was tried.

## Conclusion

The trial court abused its discretion by declaring a mistrial without first granting Harrison's request to poll the jury as to whether it had unanimously determined that the mitigating

circumstances of his crime outweighed the aggravating circumstance such that he was statutorily ineligible for the death penalty. Under these circumstances, allowing the State to seek, or the court to impose, the death penalty in the pending sentencing proceeding would violate the rights guaranteed to Harrison under the Double Jeopardy Clause. Accordingly, we REVERSE the decision of the district court and REMAND with instructions to issue a writ directing the State to refrain from seeking the death penalty at Harrison's sentencing retrial or at any future sentencing proceeding.

**REVERSED and REMANDED WITH INSTRUC-TIONS.**

---

SILVERMAN, Circuit Judge, dissenting:

The foreperson told the judge in open court, without contradiction, that the jury was deadlocked on the issue of punishment. There is no court case anywhere holding that the constitution requires a state trial judge to ask more specific questions about the status of the jury's unfinished deliberations in a sentencing matter entrusted to its discretion. In the face of the jury's return of the unsigned punishment verdict forms, plus the foreman's statement that the jury was at an impasse as to the sentence, the trial judge did not abuse her discretion in declaring a mistrial and ordering a new sentencing trial.

Two jurors sent the judge a note indicating that the jury was deadlocked between life with parole and life without parole. The remaining ten jurors neither signed nor sent such a note. Everyone agrees that a note is not a verdict.

The judge then called the jury into open court and the following colloquy occurred:

THE COURT: The court has received notes from two members of the jury indicating that the jury is deadlocked and after deliberations is unable to reach a verdict. Is that your assessment of the situation?

THE FOREPERSON: Yes.

THE COURT: Do you feel that further deliberations could aid the jury, or do you feel that the jury is at an impasse in terms of a punishment in this case?

THE FOREPERSON: I think it is at an impasse.

Although the judge's question focused on whether a verdict had been reached "in terms of a punishment in this case," and even though the notes were specifically referenced, none of the other jurors, not even the note-writers, contradicted the foreperson.

The court then obtained the four verdict forms and ascertained that only two of them had been signed by the foreperson. The two signed forms reflected unanimous findings of both aggravating and mitigating factors. It is undisputed that the findings reflected on these verdict forms do not acquit Harrison of the death penalty. To the contrary, they establish his eligibility for it.

The two remaining verdict forms were returned unsigned, reflecting a lack of unanimous agreement about whether or not the aggravation outweighed the mitigation, and whether death or some term of imprisonment should be imposed. If the jury had returned a verdict indicating unanimous agreement that the mitigation outweighed the aggravation, Harrison would have been acquitted of the death penalty. But that is not what happened. The forms calling for the weighing of the aggravation against the mitigation were returned unsigned. To recap, the verdict forms reflected unanimous findings of aggravating and mitigating factors, but no finding on whether

the aggravation outweighed the mitigation, or whether the sentence should be death or some period of incarceration.

Harrison's counsel wanted the court "to poll the 12 individual jurors and ask them individually if any of them made the determination that the mitigation outweighed the aggravations in this matter." However, the trial judge was not constitutionally obligated to question each juror individually before finding a deadlock and declaring a mistrial. According to *United States v. Cawley*, 630 F.2d 1345, 1349 (9th Cir. 1980), "[u]pon receiving a communication from the jury that agreement cannot be reached, the judge must question the jury to determine independently whether further deliberations might overcome the deadlock. A judge can appropriately determine that there is a manifest necessity for a mistrial by questioning only the jury foreman." (citations omitted).

The foreperson's answers to the judge's questions were categorical, unequivocal, uncontradicted, and consistent with the jury's failure to return a written verdict. Conspicuously missing from the majority opinion is a single federal case — or indeed any case — establishing a constitutional right to a partial verdict when it comes to sentencing, and certainly not when a jury is required to "weigh" intangible factors and ultimately determine a just punishment as a matter of discretion. The verdict in a penalty phase trial is the gestalt of the jury's weighing, balancing, and moral judgment. It is the jury's final decision that counts, not its thoughts in progress. Whether or not the state judge could have engaged in more detailed questioning, the federal constitution simply does not require an inquiry into the status of unfinished deliberations in a profoundly discretionary matter such as this before declaring a mistrial.

A trial judge has "broad discretion in deciding whether or not 'manifest necessity' justifies a discharge of the jury. . . . The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great defer-

ence by a reviewing court." *Arizona v. Washington*, 434 U.S. 497, 510 (1978). The state trial court did not abuse its discretion in finding that the jury was at an impasse with respect to the sentence and in declaring a mistrial. Because a retrial on sentencing will not violate Harrison's right against double jeopardy, *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003), the district court correctly denied the petition for writ of habeas corpus. I therefore respectfully dissent.